TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00079-CV







Owens-Corning Fiberglas Corporation, Appellant



v.



Barbara Wasiak; Tyler Turner Boulo, as personal representative of the heirs


and estate of Stanley Wasiak, deceased; James Edwin Wingate, Sr. and


Jean Wingate; Homer Clifton Brownlee, Sr. and Alma Brownlee; and Martha


Barnes, individually and as personal representative of the heirs


and estate of James Albert Barnes, deceased, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT


NO. 92-02238-A, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING







 Owens-Corning Fiberglas Corporation appeals from a judgment for compensatory
and punitive damages recovered by appellees after a jury trial. We will affirm the trial-court
judgment.



THE CONTROVERSY


 The appeal involves four actions for wrongful death, personal injury, and loss of
consortium resulting from unrelated incidents of exposure to "Kaylo," an asbestos-containing
insulation product manufactured by Owens-Corning. (1) The case was tried under the substantive
law of Alabama, the state in which the asbestos exposures occurred. See Tex. Civ. Prac. & Rem.
Code Ann. § 71.031 (West 1986).

 The jury awarded plaintiffs a total of $1.8 million in compensatory damages and
approximately $3.7 million in punitive damages. (2) Owens-Corning filed a motion for judgment
non obstante veredicto and a motion to disregard certain jury findings. After a post-verdict
hearing in which it received evidence, the trial court overruled Owens-Corning's motions. The
court rendered judgment on the jury verdict and subsequently overruled Owens-Corning's motion
for new trial. Owens-Corning brings eleven points of error.



PUNITIVE DAMAGES


 In point of error one, Owens-Corning contends the trial court erred in excluding
Peter Frank's "testimony" regarding the company's financial condition. The testimony was
offered in the form of a verbatim transcript of Mr. Frank's testimony in a previous suit. Owens-Corning maintains that the transcript should have been admitted because admissibility of evidence
is a procedural matter governed by Texas law; and, under Texas law, unlike Alabama law,
evidence of a defendant's net worth is admissible to aid the jury in its consideration of punitive
damages. (3)

 When Owens-Corning offered the transcript in evidence, appellees objected on two
grounds: (1) Alabama law precludes a jury from considering net-worth evidence, although such
evidence is relevant in the trial judge's post-verdict review of a punitive-damage award, as set out
in Green Oil Co. v. Hornsby, 539 So. 2d 218, 222 (Ala. 1989); and (2) the transcribed testimony
from the earlier lawsuit was inadmissible hearsay because there was no showing of (a) the
witness's unavailability or (b) a similar motive or opportunity on appellees' part to cross-examine
the witness. See Tex. R. Civ. Evid. 804(a), (b)(1). Without ruling expressly on the hearsay
objection, the trial court held the transcript inadmissible based on appellee's first objection. 
Afterwards, however, the court received Mr. Frank's live testimony during a post-verdict hearing. 
See Green Oil, 539 So. 2d at 222. 

 We must uphold a trial court's exclusion of evidence if there was any proper
ground for that ruling, even a ground not urged during trial. State Bar v. Evans, 774 S.W.2d
656, 658 n.5 (Tex. 1989); Minnesota Mining & Mfg. v. Nishika, Ltd., 885 S.W.2d 603, 630 (Tex.
App.--Beaumont 1994, writ denied). Owens-Corning offered Mr. Frank's testimony in the form
of a transcript of in-court testimony given in an unrelated lawsuit. In order for transcribed
testimony from another proceeding to be admissible, the proponent of the evidence must show
affirmatively that the declarant was "unavailable" as defined in Rule 804(a) of the Texas Rules
of Civil Evidence. In response to appellees' hearsay objection, Owens-Corning stated that Mr.
Frank resides in California and at the time of trial was vacationing in Europe. However, "[m]ere
comments by an attorney are not sufficient proof of a declarant's unavailability." Keene Corp.
v. Rogers, 863 S.W.2d 168, 177 (Tex. App.--Texarkana 1993, no writ). And, although Mr. Frank
may have been beyond the subpoena power of the court, Owens-Corning did not establish that it
was unable to take his deposition or otherwise procure his testimony in this cause before his
vacation. See Tex. R. Civ. Evid. 804(a)(5); Hall v. White, 525 S.W.2d 860, 862 (Tex. 1975). 
The trial judge did not err in excluding the evidence. We overrule Owens-Corning's first point
of error.

 In points of error two and three, Owens-Corning contends the trial court erred in
overruling the company's motion to disallow or remit the punitive-damage awards. Owens-Corning argues the awards are excessive on the following theory: repetitive, cumulative punitive-damage awards, in the context of mass-tort litigation involving asbestos products, violate Alabama
substantive law and state and federal due process of law because the objectives of punishment and
deterrence underlying punitive damages have already been achieved by previous punitive-damage
awards in earlier suits.

 Owens-Corning argues that substantive due process of law prohibits multiple
awards of punitive damages for a single course of conduct. This argument has been made in
numerous jurisdictions, and the United States Supreme Court has not yet ruled on whether the
constitutional guaranty of due process of law limits at some point repetitive awards in mass-tort
litigation. Several courts have expressed concern about the difficulties inherent in awarding
punitive damages in a mass-tort context and the inevitable possibility of "overkill." See King v.
Armstrong World Indus., Inc., 906 F.2d 1022, 1033 (5th Cir. 1990), cert. denied, 500 U.S. 942
(1991); Edwards v. Armstrong World Indus., Inc., 911 F.2d 1151, 1155 (5th Cir. 1990); Celotex
Corp v. Tate, 797 S.W.2d 197, 209 (Tex. App.--Corpus Christi 1990, no writ). On both due
process of law and common law grounds, however, "the vast majority of courts that have
addressed the issue have declined to strike punitive damages awards merely because they
constituted repetitive punishment for the same conduct." Dunn v. HOVIC, 1 F.3d 1371, 1385-86,
(3rd Cir.), cert. denied, 114 S.Ct. 650 (1993) (collecting state and federal cases); see also Keene
Corp. v. Kirk, 870 S.W.2d 573, 581 (Tex. App.--Dallas 1993, no writ); Andrea G. Nadel,
Propriety of Awarding Punitive Damages to Separate Plaintiffs Bringing Successive Actions
Arising Out of Common Incident or Circumstances Against Common Defendant or Defendants
("One Bite" or "First Comer" Doctrine), 11 A.L.R.4th 1261, 1262 (1982 & Supp. 1993).

 Owens-Corning cites only one reported case holding that multiple punitive-damage
awards violate the constitutional guaranty of due process of law. Juzwin v. Amtorg Trading
Corp., 705 F. Supp. 1053, 1064 (D.N.J. 1989), vacated, 718 F. Supp. 1233, 1236 (D.N.J. 1989)
("Juzwin II"). On reconsideration, however, the district court reiterated its ruling but vacated its
original order because it was unable to fashion a "fair and effective remedy." Juzwin II, 718 F.
Supp at 1236. (4)

 The theme of Owens-Corning's argument on the issue is that repetitive awards go
beyond punishment and deterrence and endanger future plaintiffs' rights to recover compensatory
damages. In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1 (1991), the Supreme Court
fixed the proper scope of appellate review of punitive-damage awards. It is to make "certain that
the punitive damages are reasonable in their amount and rational in light of their purpose to punish
what has occurred and to deter its repetition." 499 U.S. at 21.

 In Haslip, the Court upheld Alabama's common law method for assessing and
reviewing punitive-damage awards and approved the Alabama Supreme Court's criteria, as stated
in Green Oil, 539 So. 2d at 223-24, and Central Alabama Electrical Cooperative v. Tapley, 546
So. 2d 371, 377 (Ala. 1989). These criteria are designed to confine punitive-damage awards
within the policy goals underlying punitive damages. (5) To determine whether a punitive-damage
award is reasonably related to the goals of punishment and deterrence, the following factors may
be considered:



(a) whether there is a reasonable relationship between the punitive damages award
and the harm likely to result from the defendant's conduct as well as the harm that
actually has occurred; (b) the degree of reprehensibility of the defendant's conduct,
the duration of that conduct, the defendant's awareness, any concealment, and the
existence and frequency of similar past conduct; (c) the profitability to the
defendant of the wrongful conduct and the desirability of removing that profit and
of having the defendant also sustain a loss; (d) the "financial position" of the
defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions .
. . to be taken in mitigation; (g) the existence of other civil awards against the
defendant for the same conduct, these also to be taken in mitigation.



Haslip, 499 U.S. at 22-23 (the "Green Oil factors").

 In accordance with Alabama law the trial court in the present case considered the
Green Oil factors in its post-verdict hearing and stated on the record its reasons for not interfering
with the jury verdict. See Tapley, 546 So. 2d at 377. As an appellate court, we must
independently evaluate the evidence according to the same criteria. See Haslip, 499 U.S. at 21;
Tapley, 546 So. 2d at 377; see also BMW of N. Am., Inc. v. Gore, 646 So. 2d 619, 625-27 (Ala.
1994), cert. granted, 115 S.Ct. 932 (1995); Kirk, 870 S.W.2d at 583-85. However, we need
apply the Green Oil factors only as they relate to Owens-Corning's claim that the $3.7 million in
punitive-damage awards involved in this appeal are repetitive of the $3 million in punitive
damages the company has paid heretofore in other suits. (6)

 Reasonable Relationship to the Harm. This factor is inapplicable in our review of
Owens-Corning's complaint about the repetitive nature of the award because it would require us
to consider other conduct by Owens-Corning resulting in punitive awards. The Alabama Supreme
Court made clear that "when applying the reasonable relationship test to the amount of punitive
damages . . . we do not consider those acts which occurred in other jurisdictions." Gore, 646 So.
2d at 628.

 Even if we consider previous punitive-damage awards against Owens-Corning,
however, we cannot say that the aggregate of all such awards does not bear a reasonable
relationship to the harm inflicted in the present cause. See Campbell v. Williams, 638 So. 2d 804,
818 (Ala. 1994), cert. denied, 115 S.Ct. 188 (1994) (affirming $4 million punitive-damage award
for wrongful death); Sears, Roebuck & Co v. Harris, 630 So. 2d 1018, 1035 (Ala. 1993), cert.
denied, 114 S.Ct. 2135 (1994) (affirming punitive-damage award for $4 million for wrongful
death and $2.5 million for injuries to four people); Atkins v. Lee, 603 So. 2d 937, 950 (Ala. 1992)
(affirming $6.8 million punitive-damage award for wrongful death); see also General Motors
Corp. v. Johnston, 592 So. 2d 1054, 1063-64 (Ala. 1992) (examining punitive-damage awards
in wrongful death cases in other jurisdictions).

 Reprehensibility of the Conduct. The evidence permits a conclusion that Owens-Corning's conduct was sufficiently reprehensible to justify the punitive-damage awards in light
of the number of persons harmed, the duration of the company's conduct, its awareness and
concealment of danger, and the existence and frequency of similar conduct in the past. Owens-Corning manufactured "Kaylo" for approximately fourteen years and distributed it for twenty
years. There was ample evidence that Owens-Corning knew of the dangers of asbestos but
nevertheless consciously engaged in a pattern and practice of failing to warn Kaylo users of such
danger.

 Profitability of the Conduct. Punitive damages should remove any profit acquired
by the wrongful conduct and should exceed the profit so that the defendant sustains a loss. Green
Oil, 539 So. 2d at 223. Punitive damages also serve to dissuade a defendant from pursuing a
similar course of conduct in the future. See Carrier Express, Inc. v. Home Indem. Co., 860 F.
Supp. 1465, 1486 (N.D. Ala. 1994).

 Owens-Corning introduced conflicting evidence regarding Kaylo's profitability
(estimates ranged from $7.8 million to $1.5 million after-taxes). For purposes of our discussion,
we will assume a $1.5 million profit. (7) As discussed above, Owens-Corning had paid over $3
million in punitive damages before judgment in the present litigation. (8) Despite evidence that the
profit on Kaylo has been taken from the company and that Owens-Corning will likely suffer other
judgments, we cannot say that Owens-Corning has sustained a loss so excessive as to require
remittitur. The evidence does not justify that conclusion. Neither Alabama law nor due process
of law requires the striking or remitting of punitive-damage awards because the harm was so
severe as to wipe out all profit. See Carrier Express, 860 F. Supp. at 1486 (affirming $4.8
million punitive-damage award against insurer who profited only $45,000 by its bad-faith refusal
to settle); Campbell, 638 So. 2d at 818 (affirming $4 million punitive-damage award imposing $2
million personal liability against physician with annual income over $500,000); accord Dunn, 1
F.3d at 1391. 

 Owens-Corning's Financial Position. In assessing Owens-Corning's financial
position, we will consider evidence of past punitive and compensatory damages actually paid and
Owens-Corning's ability to satisfy future punitive-damage awards as well as current and future
compensatory-damage claims. See Dunn, 1 F.3d at 1391; see also Wilson v. Dukona Corp., N.V.,
547 So. 2d 70, 74 (Ala. 1989). Owens-Corning must show by evidence that the current award,
when considered in light of previous and future claims, will endanger its financial well-being or
deprive future plaintiffs of compensation. Cf. Carrier Express, 860 F. Supp. at 1486.

 As of June 1993, Owens-Corning had resolved 114,000 of 200,000 claims,
indemnifying claimants through insurance in excess of $1 billion and paying $23 million of its
own funds for uninsured indemnity or defense costs; and available insurance coverage was $350
million, with $144 million more insurance available in 1996. (9) Knowing its insurance was
inadequate to cover current and future claims, Owens-Corning created a $950 million reserve as
a charge against earnings to cover its expected out-of-pocket costs through 1999. Owens-Corning
introduced testimony that it expects to generate sufficient income to provide this reserve. 
Regarding a third category of costs, "uninsured and unreserved costs" of future claims, Owens-Corning stated, in a document (10-Q) filed in March 1993 with the Securities and Exchange
Commission, that these costs "will not materially adversely affect the company's financial
position." 

 At the time of trial, Owens-Corning had a negative net worth of approximately $1
billion. This negative net worth, however, is not attributable solely to the asbestosis claims and
does not indicate that the corporation is insolvent. To avoid a takeover attempt in 1986, Owens-Corning incurred about $2 billion of debt which ultimately resulted in a negative net worth. 
Notwithstanding that the $950 million reserve added about $568 million to Owens-Corning's
negative net worth, its net worth has remained near a negative $1 billion since 1986. It is also
material, we believe, that Owens-Corning has been able to pay down its debt from $2.5 billion
in 1986 to $1.1 billion in 1992 and that the price of its capital stock tripled between 1991 and
1993.

 As a result of our evaluation of the evidence regarding Owens-Corning's financial
status, we find the evidence does not require a remittitur of the punitive-damage award. At the
current rate of 20,000 to 25,000 asbestos claims filed per year, it is evident that Owens-Corning
will be faced with large out-of-pocket costs. Owens-Corning has planned for the payment of those
costs to the year 2000. It does not appear that Owens-Corning's corporate existence is in jeopardy
as a result of these and other awards. Although the company anticipates adverse effects in terms
of cash flow, the evidence does not show that Owens-Corning is headed for insolvency, even
without insurance. Owens-Corning has failed to show that it will be unable to pay future punitive
and compensatory awards or otherwise satisfy current and future claims. 

 Costs of Litigation. Based on the record, we find it obvious that these as well as
previous plaintiffs incurred hardship and substantial legal fees and expenses. In light of
Alabama's policy that these costs be taken into account in order to encourage plaintiffs to bring
wrongdoers to trial, this factor weighs in support of the punitive-damage award. See Green Oil,
539 So. 2d at 223; see also Gore, 646 So. 2d at 625. 

 Criminal Sanctions. Because the evidence shows no criminal sanctions that have
been imposed against Owens-Corning for its conduct, this factor does not support reduction of the
punitive-damage award. 

 Other Civil Damages for the Same Conduct. We have considered the amount and
effects of other punitive- as well as compensatory-damage awards against Owens-Corning
throughout our discussion of the Green Oil factors and concluded they do not justify a remittitur. 
Owens-Corning argues that as a result of earlier punitive-damage awards, it has been punished
repeatedly for the same course of conduct. However, Owens-Corning did not provide evidence
that the previous juries intended to punish Owens-Corning for the entire scope of its wrongful
conduct rather than for the harm inflicted on the specific plaintiffs in those previous lawsuits. (10) 
See Dunn, 1 F.3d at 1389; Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 280 (2d Cir.),
cert. dismissed, 497 U.S. 1057 (1990). 

 Upon consideration of the Green Oil factors, we conclude the sums awarded here
as punitive damages when added to previous punitive-damage awards do not violate either the
constitutional guaranty of due process of law or Alabama law. We find the sums awarded here
are reasonably related to the objectives of punishment and deterrence underlying such awards. 
A significant public interest exists in deterring Owens-Corning's conduct, and the company has
failed to show that the aggregate of punitive-damage awards against it exceeds an amount of
punishment commensurate with the entirety of its misconduct. (11) 

 For the reasons given, we overrule Owens-Corning's points of error two and three.



JURY CHARGE


 Under Alabama law, a plaintiff claiming damages caused by a defective product
must show that he was a "user" or "consumer" of the product under Alabama law, a doctrine
known as the "Alabama Extended Manufacturer's Liability Doctrine" ("AEMLD"). See Clark
Indus., Inc. v. Home Indem. Co., 591 So. 2d 458, 461 (Ala. 1991); Sanders v. Ingram Equip.,
Inc., 531 So. 2d 879, 880 (Ala. 1988). (12) In point of error seven, Owens-Corning complains the
trial court erred by failing to submit to the jury a question inquiring whether appellees were
"users" or "consumers."

 Under Alabama law, the term "user" or "consumer" includes individuals who were
exposed to a product. Casrell v. Altec Indus., Inc., 335 So. 2d 128, 133 (Ala. 1976). The issue
of exposure was submitted as part of the general AEMLD issue, which asked, "At the time the
products were sold and/or marketed, and/or distributed, were the asbestos-containing products
manufactured by the defendant to which the plaintiffs and/or plaintiff's decedents were exposed,
if any, unreasonably dangerous/defective?" (Emphasis added.) We conclude the submission
sufficiently required the jury to evaluate whether the plaintiffs were "users" or "consumers"
because of exposures to Owens-Corning's products. We therefore overrule point of error seven.

 In points of error eight and nine, Owens-Corning contends that the trial court erred
in overruling the company's objections to the definition of "unreasonably dangerous/defective"
and in refusing its proffered definition of "defect" and "unreasonably dangerous." See Deer &
Co. v. Grose, 586 So. 2d 196, 198 (Ala. 1991); Ex parte Morrison's Cafeteria, 431 So. 2d 975,
978 (Ala. 1983). Owens-Corning describes the problem as the submission of a subjective rather
than an objective definition because, rather than referring to an "ordinary consumer," the
submitted question asked whether the product was dangerous to an extent beyond that
contemplated by persons "who should be expected to use or be exposed to the product." It
contends essentially that persons who are not "ordinary consumers" might be in the group of
persons "who should be expected to use or be exposed to the product." We disagree with this
reasoning. 

 We conclude first that the charge is not subjective. The expression "should be
expected to use or be exposed to the product" connotes an objective rather than a subjective
standard. The word "should" is "used . . . to express what is probable or expected." Webster's
Third New International Dictionary 2104 (Philip B. Gove, ed., 1986). The "probable" or
"expected" consumer is the ordinary consumer possessed of ordinary knowledge.

 We note moreover that the words used in the charge were almost identical to words
the Alabama Supreme Court used in Casrell. The Casrell court, discussing the meaning of
"unreasonably dangerous," stated as follows:



The product either is or is not "unreasonably dangerous" to a person who should
be expected to use or to be exposed to it. If it is, it makes no difference whether
it is dangerous by design or defect. The important factor is whether it is safe or
dangerous when the product is used as it was intended to be used.



Casrell, 335 So. 2d at 133 (emphasis added). We overrule points of error eight and nine.

 In point of error six, Owens-Corning contends the trial court erred in overruling
its objection to the submitted definition of "negligence" because the definition imposed a duty not
recognized under controlling substantive law. The company argues that paragraph two of the
negligence definition imposes liability whenever a manufacturer markets a product that could be
anticipated to be dangerous, regardless of whether the manufacturer gave a warning, when
Alabama law imposes liability only if the manufacturer fails adequately to warn of the product's
danger. We need not consider the merits of Owens-Corning's contention because the judgment
is independently supported by the AEMLD verdict. Tex. R. App. P. 81; Boatland of Houston,
Inc. v. Bailey, 609 S.W.2d 743, 750 (Tex. 1980). We overrule point of error six.



JURY ARGUMENT


 Owens-Corning's fourth and fifth points of error pertain to certain remarks made
by plaintiffs' counsel during his rebuttal argument concerning wantonness and the purpose of
punitive damages. The remarks were as follows:



How do [punitive damages] work? I have one example of something that's been
in the paper again recently, a recurring issue. And that's the Exxon Valdease [sic]
case. I think you may remember that there was a drunk captain of a tanker in the
Alaskan northwest than ran aground. And as a result, spoiled the entire the [sic]
pristine landscape and shoreline in Alaska along with a lot of sealife [sic] and
wildlife. And Exxon had reason to know that there might be trouble with that
captain, and they disregarded that information. And what was the result? The
Court imposed --


At this point, Owens-Corning objected to the argument. The trial court overruled the objection. 
Plaintiffs' counsel continued:



And what was done? The Court imposed a 100 million dollar fine on Exxon as a
result of that for what they did for their recklessness . . . . Ladies and gentlemen,
100 million dollars in that case, and in consideration of that, what we are asking
for is that you send a message like what was done in the Exxon Valdease [sic]
case. You send a message so, as in Exxon Valdease [sic], we don't have drunk
captains sailing the oceans, running aground every two weeks. You send a
message so responsible companies in this country can compete effectively.



In point of error five, Owens-Corning contends the trial court committed reversible error by
overruling its objection because the quoted reference to the Exxon Valdez case was an improper
example, based on evidence outside the record, and prejudicial because it caused the jury to award
an excessive amount of punitive damages. 

 In order to obtain reversal of a judgment based on an improper jury argument, the
complainant must show that the argument was improper and that it was "reasonably calculated to
cause and probably did cause the rendition of an improper judgment." Tex. R. App. P. 81(b)(1);
Aultman v. Dallas Ry. & Terminal Co., 260 S.W.2d 596, 599 (Tex. 1953) (construing
predecessors of Texas Rules of Appellate Procedure 81 and 184). "The determination as to
whether the error is prejudicial . . . must be left to the sound discretion and good sense of the
appellate courts . . . from a study of the record as a whole." Martinez v. Williams, 312 S.W.2d
742, 750 (Tex. Civ. App.--Houston [1st Dist.] 1958, no writ). 

 We need not decide whether the Exxon Valdez reference was improper because we
cannot conclude, upon review of the record, that the argument was reasonably calculated to cause
and probably did cause the jury to be prejudiced or to fix an improper punitive-damage award. 
The argument appears to have been intended to illustrate the purpose and nature of punitive
damages assessed against corporations. There is ample evidence in the record, regarding Owens-Corning's conduct, to support the total $3.7 million punitive-damage award, and the size of the
individual punitive-damage awards (13) does not suggest that the jury was persuaded by the argument
to award greater sums than the jury would have awarded without the argument. Because we
cannot conclude that there is more reason than not to believe that the jury's punitive-damage
awards against Owens-Corning were caused by improper argument, we overrule Owens-Corning's
fifth point of error. See Aultman, 260 S.W.2d at 600. 

 In Owens-Corning's fourth point of error, it contends the trial court erred in
overruling the company's objection to the Exxon Valdez reference because the court's ruling was
inconsistent with its previous decision to exclude Mr. Frank's testimony about Owens-Corning's
financial position. Owens-Corning did not raise this objection during trial. If a jury argument
is so prejudicial that it could not have been rendered harmless by an instruction to disregard, then
a failure to object at the trial court will not waive the objection on appeal. See Standard Fire Ins.
Co. v. Reese, 584 S.W.2d 835, 839 (Tex. 1979); Gannett Outdoor Co. of Texas v. Kubeczka, 710
S.W.2d 79, 86 (Tex. App.--Houston [14th Dist.] 1986, no writ); Texas Civil Practice §§ 23.22[a],
at 352, 23.21, at 350 (Diane M. Allen et al. eds., 1992 ed.). In our discussion of point of error
five, we concluded that the Exxon Valdez reference was harmless in that it did not cause the
rendition of an improper verdict. By failing to object at the trial court, Owens-Corning has not
preserved this objection for our review. We overrule point of error four.



VIDEO SCRAPBOOK


 In points of error ten and eleven, Owens-Corning contends the trial court erred in
permitting the jury to see, during Mrs. Wasiak's testimony, a ten-minute "video scrapbook." The
film showed various scenes from her deceased husband's life. The company argues the film was
irrelevant, unfairly prejudicial, and hearsay.

 We have reviewed the film. We find it cumulative of photographs and testimony
by Mrs. Wasiak about her husband's baseball career. This evidence was admitted without
objection by Owens-Corning. "The general rule is that error in the admission of testimony is
deemed harmless if the objecting party subsequently permits the same or similar evidence to be
introduced without objection." Richardson v. Green, 677 S.W.2d 497, 501 (Tex. 1984); accord
John Deere Co. v. May, 773 S.W.2d 369, 376 (Tex. App.--Waco 1989, writ denied); Shenandoah
Ass'n v. J & K Properties, 741 S.W.2d 470, 494 (Tex. App.--Dallas 1987, writ denied). And if
the showing of the film was error, it was harmless in our view. We overrule points of error ten
and eleven.

 We therefore affirm the trial-court judgment.



 

 John Powers, Justice

Before Justices Powers, Aboussie and Kidd

Affirmed

Filed: February 14, 1996

Publish

 
1. Asbestos-related mesothelioma caused the death of Stanley Wasiak and Albert Barnes. 
Appellees James Wingate and Homer Brownlee developed asbestosis as a result of their exposure
to asbestos. Appellees Barbara Wasiak, Jean Wingate, Alma Brownlee and Martha Barnes
claimed loss of consortium damages due to injuries to their spouses.
2. Injured appellees Brownlee and Wingate were awarded punitive damages of $750,000 and
$100,000 respectively in addition to compensatory damages. The representatives of decedents
Wasiak and Barnes received punitive awards of $1.7 million and $1.2 million respectively. Under
Alabama's unusual wrongful-death statute, compensatory damages are not recoverable for claims
of wrongful death. See Ala. Code § 6-5-410 (1975).
3. Owens-Corning argues also that even if Alabama law applies, it was a violation of state and
federal due process of law to preclude the jury from hearing evidence regarding Owens-Corning's
financial condition. However, in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 21-22
(1991), the Supreme Court upheld the constitutionality of Alabama's post-verdict review of
punitive-damage awards during which the trial court considers evidence of a defendant's financial
condition.
4. Additionally, in support of its due process of law argument, Owens-Corning cites Ripa v.
Owens-Corning Fiberglas Corp., 660 A.2d 521 (N.J. Super. A.D. 1995), and Jadlowski v.
Owens-Corning Fiberglas Corp., 661 A.2d 814 (N.J. Super. A.D. 1995), in which punitive
damage awards were reversed. These cases are inapposite. As Owens-Corning recognizes in its
brief, the awards in these cases were reversed and remanded on other grounds. See Ripa, 660
A.2d at 537; Jadlowski, 661 A.2d at 821. In fact, Jadlowski cites Ripa as its basis for rejecting
Owens-Corning's due process of law challenge to repetitive punitive-damage awards. See
Jadlowski, 661 A.2d at 819.
5. In Haslip, the Supreme Court identified a three-stage process to assure the reasonableness
of punitive-damage awards: (1) jury instructions explaining the nature, purpose, and basis for the
award; (2) post-verdict review of the award by the trial-court; and (3) appellate review. Haslip,
499 U.S. at 19-22.


 In this case, Owens-Corning does not challenge the jury instructions as inadequate to
confine the jury's discretion to deterrence and punishment. We find the instructions appropriately
"enlightened the jury as to the punitive damages' nature and purpose, identified the damages as
punishment for civil wrongdoing of the kind involved, and explained that their imposition was not
compulsory." Id. at 19. 
6. Owens-Corning argues that the $3 million was paid to resolve only eight of twenty-three
punitive damage judgments totalling over $50 million. Except as proof that other claims exist,
we will not consider judgments pending appeal or otherwise unresolved because there is no
method for determining how much of those judgments will actually be paid. We refuse to
consider Owens-Corning's evidence that it has paid a total of $16 million in punitive damages
since the time of trial because that evidence was not in the record at the time the judgment was
rendered. See Tex. R. App. P. 55(b); University of Texas v. Morris, 344 S.W.2d 426, 429
(Tex.), cert. denied, 366 U.S. 973 (1961). Accordingly, we overrule Owens-Corning's motion
to supplement the record. 
7. Because there were no records of net profit after taxes, the $1.5 million profit figure is only
an estimated average over twenty years. The amount of profit over this period varied from year
to year, and none of the amounts have been adjusted for inflation. Additionally, this isolated
figure does not take into account that the money was reinvested either inside or outside the
company to improve the company's overall financial position.
8. See supra note 6. Owens-Corning urges us to consider that it expects to sustain an
uninsured loss of at least $1 billion as a result of its sale and manufacture of Kaylo. However,
Owens-Corning has provided no evidence regarding how much of the $1 billion expected loss will
be composed of punitive-damage awards.

 
9. Owens-Corning also possessed $133 million of liability insurance for claims apart from
products-liability claims. Although there was testimony that a substantial amount of this liability
insurance may become available to satisfy asbestosis claims, we do not consider such coverage
in our evaluation. 
10. Nor could the award in this case support the claim that the jury actually meant to punish
Owens-Corning for the entirety of misconduct. The jury were expressly instructed to consider
Owens-Corning's conduct in regard to these plaintiffs, not in regard to other injured asbestos
workers.
11.  In concluding that multiple punitive-damage awards do not violate constitutional or
substantive law, we, like many other state and federal courts, recognize "that no single court can
fashion an effective response to the national problem flowing from mass exposure to asbestos
products." Dunn, 1 F.3d at 1386; see also Fibreboard Corp. v. Pool, 813 S.W.2d 658, 687 (Tex.
App.--Texarkana 1991), cert. denied, 113 S.Ct. 2339, 3037 (1993); Spaur v. Owens-Corning
Fiberglas Corp., 510 N.W.2d 854, 866 (Iowa 1994) (collecting state and federal cases suggesting
need for legislative solution).
12.  The AEMLD is a limited form of strict products liability law adopted by the Alabama
Supreme Court in Casrell v. Altec Industries, 335 So. 2d 128, 132-33 (Ala. 1976), and Atkins v.
American Motors Corp., 335 So. 2d 134, 141 (Ala. 1976). 
13.  See supra note 2. When considered individually the awards are relatively modest. It is also
significant that, except in regard to the argument that the current punitive awards are repetitive,
Owens-Corning does not challenge the sufficiency of the evidence to support the awards.



s-Corning recognizes in its
brief, the awards in these cases were reversed and remanded on other grounds. See Ripa, 660
A.2d at 537; Jadlowski, 661 A.2d at 821. In fact, Jadlowski cites Ripa as its basis for rejecting
Owens-Corning's due process of law challenge to repetitive punitive-damage awards. See
Jadlowski, 661 A.2d at 819.
5. In Haslip, the Supreme Court identified a three-stage process to assure the reasonableness
of punitive-damage awards: (1) jury instructions explaining the nature, purpose, and basis for the
award; (2) post-verdict review of the award by the trial-court; and (3) appellate review. Haslip,
499 U.S. at 19-22.


 In this case, Owens-Corning does not challenge the jury instructions as inadequate to
confine the jury's discretion to deterrence and punishment. We find the instructions appropriately
"enlightened the jury as to the punitive damages' nature and purpose, identified the damages as
punishment for civil wrongdoing of the kind involved, and explained that their imposition was not
compulsory." Id. at 19. 
6. Owens-Corning argues that the $3 million was paid to resolve only eight of twenty-three
punitive damage judgments totalling over $50 million. Except as proof that other claims exist,
we will not consider judgments pending appeal or otherwise unresolved because there is no
method for determining how much of those judgments will actually be paid. We refuse to
consider Owens-Corning's evidence that it has paid a total of $16 million in punitive damages
since the time of trial because that evidence was not in the record at the time the judgment was
rendered. See Tex. R. App. P. 55(b); University of Texas v. Morris, 344 S.W.2d 426, 429
(Tex.), cert. denied, 366 U.S. 973 (1961). Accordingly, we overrule Owens-Corning's motion
to supplement the record. 
7. Because there were no records of net profit after taxes, the $1.5 million profit figure is only
an estimated avera