## BROWNSVILLE PEDIATRIC ASSOCIATION and Dr. Gloria Medina, Appellants,

v.

## Jaime REYES, as Next Friend of Juan Pablo Reyes, an Incompetent, Appellee.

No. 13–00–273–CV.

Court of Appeals of Texas, Corpus Christi.

Jan. 3, 2002.

Reagan Wm. Simpson, Fulbright & Jaworski, Houston, W. Wendell Hall, Fulbright & Jaworski, San Antonio, for appellants.

Jeffrey Lee Hoffman, Stan L. Pfeiffer, Pfeiffer, Vacek, Pfeiffer, Scruggs & Hoffman, Houston, Randall P. Crane, Law Office of Randall P. Crane, San Benito, for appellee.

Before Chief Justice VALDEZ and Justices DORSEY and RODRIGUEZ.

## OPINION

Opinion by Justice RODRIGUEZ.

This is a medical malpractice case filed against appellants, Dr. Gloria Medina and her employer, Brownsville Pediatric Association, by appellee, Jaime Reyes, as next friend of Juan Pablo Reyes. A jury found Dr. Medina negligent in caring for Juan Pablo when he was a newborn. By seven issues, appellants contend (1) the evidence of medical causation is legally and factually insufficient, (2) the damage award is excessive, and (3) the trial court committed reversible error on evidentiary issues. Appellants also challenge the award of

prejudgment interest against Brownsville Pediatric Association. We affirm.

Juan Pablo, a twin, was born prematurely on February 1, 1978. He was transferred to Valley Community Hospital where Dr. Medina assumed his care for approximately nine weeks until his discharge. Upon discharge from Valley Community Juan Pablo was blind and suffering from severe neurological impairments, including spastic paraplegia. The type of brain damage sustained by Juan Pablo is Periventricular Leukomalacia (PVL).

On August 30, 1996, approximately eighteen years after Juan Pablo's birth, suit was filed against a number of health care providers who had cared for Juan Pablo when he was born. Dr. Medina was one of the original defendants. Brownsville Pediatric Association was added as a defendant in October 1997. Two years later the case was tried to a jury. Finding Dr. Medina's negligence proximately caused Juan Pablo's injury, the jury returned a verdict against appellants and awarded damages exceeding $8,000,000.00, of which $6,500,000.00 was for future medical care. After applying settlement credits,[1] the trial court rendered judgment for Juan Pablo against Dr. Medina and Brownsville Pediatric Association in the amount of $3,318,420.30, including prejudgment interest.

■ By their first two issues, appellants complain of the sufficiency of the evidence. In analyzing a no-evidence complaint, this Court considers all evidence in a light most favorable to the party in whose favor the verdict has been rendered. *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). We will re-

verse only if no more than a scintilla of evidence supports the verdict. *Havner,* 953 S.W.2d at 711. In analyzing a factual sufficiency complaint, this Court reviews all the evidence and reverses if the evidence supporting the verdict is so weak as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). Because we are not fact finders, this Court may not substitute its judgment for that of the trier of fact, even if a different answer could be reached on the evidence. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). Furthermore, the amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Id.* (citing *Mayes v. Stewart,* 11 S.W.3d 440, 451 (Tex.App.-Houston [14th Dist.] 2000, pet. denied)).

Appellants contend in their first issue that the evidence is legally and factually insufficient to support a finding that Dr. Medina's negligence proximately caused the injuries sustained by Juan Pablo, one of the elements a plaintiff must prove in a medical malpractice cause of action in order to prevail. *See id.* Appellants contend that while the record contains generalized testimony from Juan Pablo's experts, Drs. Stanley Sharpe and Alison Brent, that the conduct of Dr. Medina caused Juan Pablo's blindness and/or brain damage, there is no testimony specifically identifying any single act or omission as a proximate cause of Juan Pablo's poor outcome.

■■ To establish causation in a medical malpractice case,

plaintiffs are required to show evidence of a "reasonable medical probability" or "reasonable probability" that their injuries were proximately caused by the negligence of one or more defendants.

1. All other defendants settled, leaving appellants as the only defendants in this case.

We have interpreted this requirement to mean that the ultimate standard of proof on the causation issue "is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred."

*Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex.1995) (citations omitted); *see Arguelles v. U.T. Family Med. Ctr.*, 941 S.W.2d 255, 258 (Tex.App.-Corpus Christi 1996, no writ). While the precise words of "reasonable medical probability" are not essential, evidence of causation must still rise above mere conjecture or possibility. *See Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex.1988); *Bradley v. Rogers*, 879 S.W.2d 947, 956 (Tex.App.-Houston [14th Dist.] 1994, writ denied).

Appellants assert that the evidence does not show that the following acts, either individually or collectively, about which appellee complains, caused Juan Pablo's injuries:

1. Under-ventilating and over-ventilating the infant;
2. Not performing intubations quickly enough while, at the same time, not making a proper use of an Ambu bag; and
3. Performing a double volume exchange transfusion when it was not indicated and then performing the procedure too quickly.[2]

■ Dr. Brent testified that Dr. Medina first ordered the ventilator set to breathe in for two seconds and out for one second. This resulted in a buildup of acid. Dr. Medina then ordered a change in the ventilator setting to breathe in for one second and out for two. The carbon dioxide ($CO_2$) levels started down; however, as Dr. Brent testified, when the $CO_2$ level drops too low, the blood supply to the brain will be constricted causing death of brain cells or PVL. Dr. Brent explained:

> What happens is that when blood comes into your brain, it comes in to [sic] big vessels, and then these vessels branch off into smaller vessels.... So when you don't get much flow coming, first the blood, you are going to get it to the areas of the larger vessels, and then a little bit less will go into the smaller vessels, and when they timely get up to these little teeny vessels here, there is not enough pressure going to get the oxygen and nutrients out there. So these tissues around the ventricles we call the periventricular area, we start seeing evidence of cell death, and that's what we are seeing in cases of [PVL], these are areas that have died.... We are not getting good p[er]fusion, and we know the major indicator of that is this very low carbon dioxide blow out.

When asked if this is what occurred in Juan Pablo's case, Dr. Brent answered, "I am most certain that's exactly what happened." On cross-examination, she added,

> [t]hey left [Juan Pablo] over-ventilated with high pHs and low $CO_2$s, and that's where I think all the long term cumulative damage occurred, by sitting with

**2.** At trial, appellee also claimed that Dr. Medina was negligent in: (1) not accompanying the infant when he was being transferred from Brownsville Medical Center to Valley Community Hospital; (2) prescribing Priscoline without blood-pressure monitoring; (3) miscalculating the dosage of sodium bicarbonate and administering the prescribed dosage too slowly; and (4) allowing the blood pressure monitor to be taken from the infant and used for an adult cardiac patient. Appellant briefed these alleged negligent acts and argued that there is no evidence to establish negligence in these areas. Appellee's brief did not address appellants' insufficiency point of error regarding these claims. Given our resolution of this point, however, we need not address the remaining acts.

that very low CO2, which we know from the scientific literature slows down brain p[er]fusion, slows down oxygen getting to your brain, causes that [PVL], and the bad neurological outcome and brain cell death.

Dr. Sharpe similarly testified that Juan Pablo was over-ventilated for over forty-eight hours, with no change in the ventilator setting ordered by Dr. Medina. He testified that "the [charted] blood gasses ... show that the carbon dioxide value is getting too low for the infant," and that "these [low carbon dioxide] values reduce the blood supply to this infant's brain." Dr. Sharpe agreed that over-ventilation to the point of causing loss of blood perfusion to the center of the brain was another area of real concern with him because over-ventilating causes a person to be in Juan Pablo's condition.

Dr. Brent also testified that she found seven occasions in Juan Pablo's medical records where there were problems with intubations and extubations performed by Dr. Medina, problems that absolutely contributed to Juan Pablo's condition. She responded that "[t]hese long extended periods of the baby just languishing there is a big part of why he did so poorly in the long haul." Dr. Sharpe was also critical of Dr. Medina's care in this area. Dr. Sharpe identified four specific instances and described them as "prolonged, unreasonable, and bad judgment." Dr. Sharpe concluded:

Q: The extubation and then re-intubation problems, in a nutshell, what's the problem there, what's that going to do to this boy?

A: These caused periods of shock in him, adds to the problem of brain damage.

The record also reveals testimony regarding the cause of Juan Pablo's blindness and the ventilation and intuba-tion/extubation procedures utilized by Dr. Medina. Dr. Sharpe explained that over-oxygenation can cause the type of blindness, retinopathy of prematurity (ROP), experienced by Juan Pablo. Dr. Sharpe testified that Juan Pablo's Valley Community medical records show that on most of the days he was there, the oxygen levels far exceeded safe levels, and the levels were not adjusted. He then testified:

Q: And ultimate[ly] that causes—

A: That would render the baby visually handicapped or even blind.

Q: Such as Juan Pablo?

A: As would have occurred in his case.

In summary, Dr. Brent agreed that each item identified, including improper ventilator management and multiple extubations and intubations, played a role in causing Juan Pablo's brain damage and blindness. Finally, near the end of his direct examination, Dr. Sharpe also summarized that the failures on the part of Dr. Medina proximately caused Juan Pablo's condition. His testimony concluded with the following exchange:

Q: But for this treatment received from [Dr. Medina], do you feel based upon reasonable medical probability, that Juan Pablo Reyes would be sitting in that wheel chair today?

A: No.

Considering all evidence in a light most favorable to Juan Pablo, we conclude the evidence presented to establish causation on the basis of ventilation and intuba-tion/extubation is legally sufficient. There is more than a scintilla of evidence to support the verdict of negligence as to Dr. Medina. The evidence of causation rises above mere conjecture or possibility. It establishes that Dr. Medina's acts and/or omissions regarding Juan Pablo's ventilator settings and intubations/extubations

were substantial factors in bringing about the harm and without which the harm would not have occurred. Furthermore, reviewing all of the evidence, this causation evidence supporting the verdict is factually sufficient. It is not so weak as to be clearly wrong and manifestly unjust. We overrule appellants' first issue.[3]

By their second issue, appellants contend that the evidence does not support the $6,500,000.00 damage award for future medical expenses.[4] To recover future medical expenses, Juan Pablo must establish (1) in all reasonable probability, future medical care will be required; and, (2) the costs are reasonable. *See Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex.App.-Houston [1st Dist.] 1999, pet. denied); *Thrailkill v. Montgomery Ward & Co.*, 670 S.W.2d 382, 384 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). The standard of review for an excessive damage complaint is factual sufficiency. *N. Am. Refractory Co. v. Easter*, 988 S.W.2d 904, 912 (Tex.App.-Corpus Christi 1999, pet. denied).

Dr. Kenneth McCoin, Juan Pablo's economist, testified that, based on life expectancy tables, a person the age of Juan Pablo has a life expectancy of approximately fifty-three years. Appellants contend that Dr. McCoin did not use accurate information on life expectancy in performing his calculations because he did not take into account Juan Pablo's decreased life expectancy.[5] However, Dr. McCoin also testified, as did Juan Pablo's rehabilitation expert, Diane Gutierrez, that the life tables are average life expectancies that include within them individuals such as Juan Pablo. The jury was also advised that even with a shortened life expectancy because of his condition, Juan Pablo's life expectancy would be prolonged with appropriate care, and that he was receiving quality care from his family. Appellee further presented evidence that the annual cost of Juan Pablo's future medical treatment would be as much as $131,054.68; thus, the total for fifty-three years based on that evidence would be $6,945,898.04. The award was for $6,500,000.00.

Issues such as life expectancy, medical advances and the future costs of products and services are, by their very nature, uncertain, and therefore, appellate courts are particularly reluctant to disturb a jury's award of these damages. *Pipgras v. Hart*, 832 S.W.2d 360, 365 (Tex.App.-Fort Worth 1992, writ denied); *see Thate v. Texas & Pac. Ry. Co.*, 595 S.W.2d 591, 601 (Tex.Civ.App.-Dallas 1980, writ dism'd) (determination of future medical treatment committed to sound discretion of jury on proper instructions from court). From this testimony, the jury could have determined that fifty-three years was an average life expectancy for Juan Pablo, and computed from that figure the total amount awarded for future medical expenses.

Appellants also contend that the award is excessive because the costs related to a proposed spinal implant pump totaling $490,112.67 are speculative, and,

---

**3.** Because we have concluded the evidence is legally and factually sufficient to establish Dr. Medina's negligence based on appellee's ventilation and intubation/extubation claims, we need not address appellants' issue regarding the double volume exchange transfusion.

**4.** Appellants do not challenge the non-economic awards of actual damages, nor do they

challenge the awards for lost earning capacity.

**5.** Juan Pablo's rehabilitation expert, Diane Gutierrez, testified that Juan Pablo's life expectancy would be ten to twenty percent less than normal, if he received good care.

thus, not recoverable. While speculative damages are not recoverable, damages that are ascertainable through reference to some definite standard, established experience, or direct inference from known facts are recoverable. *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 615 (Tex.App.-Dallas 1990, writ denied); *Berry Contracting, Inc. v. Coastal States Petrochemical Co.*, 635 S.W.2d 759, 761 (Tex.App.-Corpus Christi 1982, writ ref'd n.r.e.). The jury may award such damages based upon, *inter alia,* the nature of the injury, the medical care rendered prior to trial, and the condition of the injured party at the time of trial. *City of San Antonio v. Vela,* 762 S.W.2d 314, 321 (Tex.App.-San Antonio 1988, writ denied).

■ The evidence reveals that Juan Pablo has severe problems with his muscle tone and spasticity. The use of a Baclofen pump to help his muscle tone and spasticity associated with his cerebral palsy was specifically recommended for a trial period by Dr. Stelly Sites, an orthopedic consultant, in order to determine whether the medication would make a difference in the muscle tone. Furthermore, Dr. Rae Langford, who prepared a lifecare plan for Juan Pablo, testified that, in her experience, Baclofen pumps work quite often, although she admitted there would have to be a trial period to determine its success. Gutierrez also testified that there was a reasonable probability that Juan Pablo would need different techniques to treat his spasticity in an effort to help his tone problems, perhaps medication or surgical intervention. From this testimony, the jury was entitled to conclude that Juan Pablo would need the Baclofen pump and that there was a reasonable likelihood that it would be successful. Additionally, Dr. Langford testified that the initial cost of the surgery to implant the pump would be $25,411.61. Thereafter, there would be a cost associat-

ed with refilling the pump every six weeks including the cost of the medication and the cost of doctor visits, averaging $5,648.51 annually. There would also be a need for replacement batteries for the pump approximately every eight years at an annualized cost of between $2,000.00 to $2,875.00. We conclude that the evidence establishes both the reasonable cost of this future medical care and the reasonable probability such medical care will be required.

Having reviewed the evidence, the jury's finding is not so weak as to be clearly wrong and manifestly unjust on the issue of future medical expenses. Accordingly, we conclude the evidence is sufficient to support the jury's finding. Appellants' second issue is overruled.

By issues three and five, appellants complain of evidentiary rulings. In their third issue, appellants complain that defense counsel unfairly injected insurance into the case during the examination of economist, Dr. McCoin, and, thus, the court erred in refusing to grant a mistrial. Appellants argue that because the vital issues in this case were closely contested and the injection of insurance left an inappropriate impression, harmfulness resulted. *See M.J. Constr. Co. v. Deatherage,* 231 S.W.2d 501, 502 (Tex.Civ.App.-Eastland 1950, no writ) (judgment reversed where insurance injected in closely contested case and evidence revealed jury could have fixed plaintiff's damages at much smaller sum than amount fixed or could have rendered judgment for defendant).

■ Evidentiary rulings are reviewed for an abuse of discretion. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558–59 (Tex.1995). This Court must review the entire record to determine whether the whole case turned on the evidence about which appellants complain. *See* Tex.R.App. P. 44.1(a); *Gee*

*v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). The purpose of Texas Rule of Evidence 411 is to avoid informing the jury that someone other than the defendant may be liable to pay the damages. *See* TEX.R. EVID. 411 (evidence of liability insurance not admissible upon issue of negligence). Not every mention of the word "insurance" is grounds for a mistrial, or even error. *See, e.g., Thornhill v. Ronnie's I–45 Truck Stop, Inc.*, 944 S.W.2d 780, 794 (Tex.App.-Beaumont 1997, writ dism'd by agr.) (no error found where insurance injected but offered not to show negligence, but to show control over premises). In the absence of a clear showing by the complaining party that any reference to insurance resulted in any harm or prejudice, refusal to declare a mistrial is not error. *See Red Ball Motor Freight, Inc. v. Cordova*, 332 S.W.2d 753, 757 (Tex. Civ.App.-Beaumont 1960, writ ref'd n.r.e.); *Southwestern Freight Lines v. McConnell*, 269 S.W.2d 427, 430–31 (Tex.Civ.App.-El Paso 1954, writ ref'd n.r.e.).

■ Here appellants objected to the mention of insurance in the context of an insurance company issuing an annuity. The reference to insurance in this instance is not the type of injection of insurance into a case that is protected by this rule.[6] Thus, the harm the rule was designed to

prevent does not come into play. *See Thornhill*, 944 S.W.2d at 794. Furthermore, other than making general assertions, appellants have not made a clear showing that they were harmed or prejudiced by this reference. The trial court did not abuse its discretion when it admitted testimony regarding insurance in this instance, and, thus, did not err in denying appellants' motion for mistrial.

■ Moreover, even had we found error, in order to establish reversible error, we would need to determine that the error was reasonably calculated to cause and probably did cause the rendition of a verdict which the jury might not otherwise have rendered. TEX.R.APP. P. 44.1(a)(1); *Owens–Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 557 (Tex.App.-Houston [1st Dist.] 1996), *aff'd* 972 S.W.2d 35 (Tex.1998); *Dennis v. Hulse*, 362 S.W.2d 308, 309 (Tex.1962); *Beall v. Ditmore*, 867 S.W.2d 791, 795 (Tex.App.-El Paso 1993, writ denied). "The determination as to whether the error is prejudicial or harmless must be left in the sound discretion and good sense of the appellate courts." *Owens Corning Fiberglas Corp. v. Wasiak*, 917 S.W.2d 883, 894 (Tex.App.-Austin 1996, no writ) (quoting *Martinez v. Williams*, 312 S.W.2d 742, 750 (Tex.Civ.App.-Hous-

---

**6.** In support of their argument, appellants cite only cases involving parties protected by liability insurance. *See, e.g., Tex. Co. v. Betterton*, 126 Tex. 359, 88 S.W.2d 1039, 1040 (1936) ("[I]t is error to bring to the jury the information or impression that the defendant carries liability insurance."); *Atchison, Topeka & Santa Fe Ry. Co. v. Acosta*, 435 S.W.2d 539, 549 (Tex.Civ.App.-Houston [1st Dist.] 1968, writ ref'd n.r.e.) ("[W]here the plaintiff by artful questions attempts to convey to the jury the information that the defendant probably is protected by indemnity insurance, a mistrial should be declared."); *Martinez v. Williams*, 312 S.W.2d 742, 750 (Tex.Civ.App.-Houston 1958, no writ) (although plaintiff's counsel did not specifically advise the jury

that defendant was protected by insurance "[s]ome of the jurors in all probability understood what counsel evidently intended to convey to them."); *M.J. Constr. Co. v. Deatherage*, 231 S.W.2d 501, 502 (Tex.Civ.App.-Eastland 1950, no writ) (plaintiff's testimony that he was examined by a doctor seen at the request of the "insurance people ... undoubtedly had the effect to create in the minds of the jurors the impression that defendants were protected by insurance."). Appellants provide us with no authority, and we find none, that stands for the proposition that reversible error results from the injection of insurance related to other aspects of the case, specifically a reference to an the insurance company from which an annuity might be purchased.

ton 1958, no writ)). In light of the whole case, even had we concluded error, we cannot say appellee's injection of the word "insurance" in this instance caused the rendition of an improper judgment in this case. Appellant's third issue is overruled.

■ Appellants complain of a second evidentiary ruling in their fifth issue. They contend the trial court again erred in admitting evidence regarding prior lawsuits, and not granting a mistrial. Appellants argue that the evidence of prior lawsuits is so prejudicial as to be incurable, and urge that we should review this issue even though no objections were made at trial. Appellee asserts that appellants have not preserved this complaint.

As an adverse witness, counsel for appellee attempted to impeach Dr. Medina with her prior deposition testimony. When Dr. Medina was nonresponsive, appellee's trial counsel informed her that her own attorney would give her the opportunity to explain her answers. In response Dr. Medina said, "I am not familiar with the legal system." After her comment, counsel approached the bench and received permission from the court to ask Dr. Medina about three other occasions in which she had been sued and had given depositions. The following exchange between counsel and Dr. Medina followed:

Q: Dr. Medina, you say you are not familiar with the legal system. The plain fact is you have been sued before on other occasions, have you not?

A: Yes, I have been sued.

Q: On how many occasions?

A: I was sued—

Q: Just the number, please?

A: I was sued three times.

Q: And in those situations, were you not familiar with the legal system, did you have an attorney?

A: Ah—

Q: Did you have an attorney?

A: Yes.

Q: Did you give sworn testimony just like you are giving in these cases— in this case, give depositions?

A: Ah—

Q: Did you give depositions?

A: I gave depositions.

Q: Do not tell me what was said, just tell me did you speak with your attorney about the cases that you would go through then?

A: Not like in this case.

Appellants contend Dr. Medina's trial counsel did not wish to call attention to the testimony and, therefore, waited until the next break to move for a mistrial. However, our review of the record reveals that the request for mistrial was not made until after some twenty-four pages of testimony later and after a recess had ensued. We conclude appellants have not properly preserved this issue. Furthermore, we cannot conclude that admission of testimony regarding prior lawsuits amounts to incurable error. Appellants cite us to a number of cases where the courts have concluded or recognized the possibility of incurable error.[7] However, we find the cited author-

---

7. *See, e.g., Weidner v. Sanchez,* 14 S.W.3d 353, 363 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (violations of limine order can amount to incurable error); *NationsBank of Tex., N.A. v. Akin, Gump, Hauer & Feld, L.L.P.,* 979 S.W.2d 385, 398–400 (Tex.App.-Corpus Christi 1998, pet. denied) (incurable improper jury argument); *Cecil v. T.M.E. Inv., Inc.,* 893 S.W.2d 38, 49–50 (Tex.App.-Corpus Christi 1994, no writ) (court recognized that improper admonishments of counsel by trial judge could result in incurable error); *Kendrix v. S. Pac. Transp. Co.,* 907 S.W.2d 111, 113 (Tex.App.-Beaumont 1995, writ denied) (no instruction could mitigate inescapable conclusion that brother-in-law sued plaintiff, blaming him, not the

ity is not persuasive under the facts of this case. Accordingly, we overrule the fifth issue.

By issue four, appellants contend the trial court erred in excluding the testimony of defense expert, Dr. Frank Kretzer, as rebuttal evidence to establish that other factors, specifically diabetes and prematurity, could have caused Juan Pablo's blindness. Appellants raise the novel question of whether the rigors of Texas Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its Texas progeny apply to a defense expert who is testifying for a party who does not have the burden of proof on the issue, but who is testifying only about possible causes that could have led to injuries and damages in this case. *Cf. Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 632–47 (Tex.App.-El Paso 2001, pet denied) (court affirmed no negligence finding without directly addressing defendant's reasoning that "because a defendant does not have the burden to prove the absence of negligence or causation by a preponderance of the evidence, a plaintiff may not attack the reliability and competency of the defendant's expert testimony in the context of a factual sufficiency challenge").

The essence of rule 702 and *Daubert* is that the trial judge is to act as a gatekeeper to determine whether the witness's testimony is going to assist the jury. Appellant's argument is that a defense witness should be excluded from this scrutiny. We disagree.

 Rule 702 of the Texas Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Tex.R. Evid. 702. In *Robinson*, 923 S.W.2d at 558, the Texas Supreme Court held that before allowing an expert to testify under rule 702, the trial court must make an initial determination whether the expert's opinions are based upon methods and research which are reliable. *Id.* The court noted:

There are many factors that a trial court may consider in making the threshold determination of admissibility.... These factors include, but are not limited to: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory ... has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory....

*Id.* at 557. Because this Court believes any expert's opinions should be based upon methods and research which are reliable regardless of which party has the burden of proof, we conclude that rule 702 and the *Daubert* line of cases should apply to all expert witnesses, those testifying for the defendant as well as those testifying for the plaintiff.

---

railroad, for collision); *Dove v. Dir., State Employees Workers' Comp. Div.*, 857 S.W.2d 577, 580 (Tex.App.-Houston [1st Dist.] 1993, writ denied) (violations of limine order can amount to incurable error); *Kneip v. United-*

bank Victoria, 734 S.W.2d 130, 136–37 (Tex. App.-Corpus Christi 1987, no writ) (court suggested improper testimony could be as incurable as jury argument).

Outside the presence of the jury, after hearing plaintiff's motion to exclude Dr. Kretzer's testimony, the trial court granted the motion. The key point appellants sought to illicit from Dr. Kretzer was the possibility that one of the risks associated with Juan Pablo's blindness, ROP, was the fact that his mother was a diabetic. Dr. Kretzer based his testimony, in part, on one pair of whole eye donations from a pre-term infant of a diabetic mother. Dr. Kretzer could not, however, tell the court why the infant donor, who he considered healthy otherwise, had died. Dr. Kretzer also based his testimony on his study of rats. However, we note that this study was rejected for publication by his peers because rat retinas are different from human retinas. Dr. Kretzer also admitted that there is no statistical data to support any relationship between maternal diabetes and ROP, only what Dr. Kretzer described as "lore" in the literature, a trend. Based on this testimony, the trial court could have determined that Dr. Kretzer's opinion that maternal diabetes is related to ROP in a pre-term infant was not based on methods and research that were reliable.

Further, even assuming a scientific basis for his opinion, Dr. Kretzer admitted it would be necessary for Mrs. Reyes to have been suffering from diabetic retinopathy during her pregnancy for any causal connection to be established. There is no evidence that Mrs. Reyes in fact suffered from diabetic retinopathy. Thus, the foundation of Dr. Kretzer's testimony was built upon facts that did not exist in the record. We conclude this testimony was properly excluded.

Dr. Kretzer's other excluded opinions about which appellants now complain in-volve prematurity and low birth weight as it relates to prematurity. However, it is apparent from Dr. Kretzer's own writings that the levels of prematurity and birth weight which he contends to be significant factors in causing the blinding form of ROP were birth before the 27th week of gestation and a birth weight of below 1000 grams. Juan Pablo was between 28 and 32 weeks of gestational age and weighed over 1000 grams at birth. Dr. Kretzer's statistics do not apply to Juan Pablo's actual condition. When confronted with Juan Pablo's actual weight and gestational period, Dr. Kretzer conceded that the chance of these factors being responsible for Juan Pablo's blindness was remote, at best. Again, we conclude the trial court did not err in excluding this testimony. Issue four is overruled.

In the sixth issue, appellants contend that the judgment imposes excessive prejudgment interest against Brownsville Pediatric Association and should be modified.[8] The trial court figured the amount of prejudgment interest from "the date this suit was filed," August 30, 1996. Brownsville Pediatric Association claims the assessment should have been figured from the date it was added as a defendant in the lawsuit, October 9, 1997.

According to section 304.104 of the Texas Finance Code, prejudgment interest accrues beginning on the 180th day after the date the defendant receives written notice of a claim or on the date suit is filed, whichever occurs first. TEX. FIN. CODE ANN. § 304.104 (Vernon Supp.2000). The starting of the prejudgment clock is purely a statutory matter. "When interpreting the intent and meaning of a statute, the court focuses on, and will follow,

8. We note that the sixth issue does not apply to Dr. Medina as she was a defendant when the lawsuit was first filed.

the plain language of the statute unless doing so leads to absurd and unintended consequences." *Garcia v. Willman,* 4 S.W.3d 307, 310 (Tex.App.-Corpus Christi 1999, no pet.) (citing *Schwenke v. State,* 960 S.W.2d 227, 230 (Tex.App.-Corpus Christi 1997, pet. denied)). The statute refers to "the date suit is filed." That is the date used by the trial court. Using the date the defendant was first sued as suggested by Brownsville Pediatric Association, rather than the date the lawsuit was filed, is contrary to the plain language of section 304.104.

Brownsville Pediatric Association relies on *Thrift v. Hubbard,* 44 F.3d 348, 362 (5th Cir.1995), for the proposition that the clock should not have started until it was named as a defendant. In *Thrift,* the appellate court chose to toll the interest clock until intentional infliction of emotional distress, the relevant cause of action, was first asserted as a claim. *Id.* By tolling prejudgment interest, the court kept the plaintiff from recovering interest on a cause of action that the plaintiff delayed in filing until well into the lawsuit. *Id. Thrift* is distinguishable on its facts. Further, Brownsville Pediatric Association's reliance on it is misplaced because delay is not being urged as a basis for its argument.

Furthermore, had Brownsville Pediatric Association chosen to argue that plaintiffs delayed in bringing it into the lawsuit, thus prejudgment interest should not have been assessed until that time, section 304.108 gives the trial court discretion to toll the accrual of prejudgment interest during "periods of delay caused by a claimant." TEX. FIN.CODE ANN. § 304.108(b)(2). We find no evidence in the record that prejudgment interest was tolled during the course of the lawsuit as to Brownsville Pediatric Association, or that such a request was made at the trial level. Appellants' sixth issue is overruled.

■ Finally, by their seventh issue, appellants complain that the judgment entered against them violates the statutory cap on damages contained in section 11.02 of article 4590i of the Texas Revised Civil Statutes. *See* TEX.REV.CIV. STAT. ANN. art. 4590i § 11.02 (Vernon Supp.2001). However, appellee's claims are purely common law injury claims. In *Lucas v. United States,* 757 S.W.2d 687, 692 (Tex.1988), the Texas Supreme Court held that the damage cap contained in section 11.02 "is inconsistent with and violative of article I, section 13, of the Texas Constitution." *Id.* Later in *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 844–45 (Tex.1990), the court reaffirmed its holding in *Lucas. Rose,* 801 S.W.2d at 844–45. Again in *Diaz v. Westphal,* 941 S.W.2d 96, 100 (Tex.1997), and *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 901–02 (Tex.2000), the court refused to reverse its decision in *Lucas.* Following precedent, we overrule appellants' seventh issue.

The judgment of the trial court is affirmed.