

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00538-CV

William Alec **TISDALL**, M.D., and William A. Tisdall, M.D., P.A.
d/b/a Spine & Joint Pain Specialists,
Appellants

v.

Thomas **VAREBROOK** and Rebecca Varebrook,
Appellees

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-CI-06007
Honorable Michael E. Mery, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:    Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: July 28, 2021

AFFIRMED

William Alec Tisdall, M.D., and William A. Tisdall, M.D., P.A., d/b/a Spine & Joint Pain

Specialists, (collectively, "Tisdall"), appeal from a final judgment in a medical negligence case. A

jury found in favor of the Varebrooks and, consistent with the verdict, the trial court rendered

judgment against Tisdall and in favor of his former patient, Thomas Varebrook ("Thomas"), for

$2,506,628.69, and Thomas's wife, Rebecca Varebrook ("Rebecca") for $10,889.39. In three

issues, Tisdall argues the trial court abused its discretion by: (1) allowing improper jury argument;

(2) admitting into evidence five independent medical examinations; and (3) denying his motion for mistrial. We affirm the trial court's judgment.

## BACKGROUND

Tisdall started treating Thomas for back and leg pain in September 2013. At his initial visit, Thomas complained of chronic pain radiating down his right leg. Between October 2013 and April 2015, Thomas was seen ten times by Tisdall's physician assistant. At most of these visits, Thomas complained of lower back pain and only right leg pain. At the last visit, which was on April 7, 2015, Thomas complained of pain in both legs. On May 27, 2015, Tisdall performed multiple steroid injections on Thomas, including a steroid injection to his left sacroiliac joint. In June 2015, Thomas was hospitalized with a septic left sacroiliac joint. This required Thomas to undergo multiple hospitalizations and surgeries for debridement and irrigation of the sacroiliac joint. Additionally, Thomas, who was employed as a police officer, was no longer able to perform his job duties.

In March 2017, the Varebrooks sued Tisdall for medical negligence. In their pleadings, the Varebrooks alleged that Tisdall had breached the standard of care by, among other things, failing to perform a proper physical examination of Thomas, failing to properly recommend and/or perform targeted diagnostic and therapeutic injections, recommending and/or performing an injection on Thomas's left sacroiliac joint, and failing to use proper sterile techniques when administering the injections. The Varebrooks further alleged that Tisdall's acts and/or omissions caused permanent physical injuries to Thomas, and sought damages for Thomas's past and future physical pain and mental anguish, lost earning capacity, disfigurement, physical impairment, and medical care expenses; and for his wife's past and future loss of household services and loss of consortium.

Tisdall answered the Varebrooks' suit, denying the allegations in their pleadings.

At trial, the Varebrooks contended that the left sacroiliac joint injection administered on May 27, 2015, was unnecessary because Thomas did not have pain on the left side of his lower back. The Varebrooks' medical expert testified that the injection that Tisdall administered to Thomas's left sacroiliac joint introduced bacteria into the joint, which caused an infection and sepsis. The Varebrooks presented evidence about Thomas's physical condition following the injections. Two days after the injections, Thomas started to feel intense pain in his lower back and left leg. By June 10, 2015, Thomas was using a wheelchair because he was unable to stand or walk due to pain, numbness, and weakness in his left leg. By June 15, 2015, Thomas was admitted to the hospital for an infection of the left sacroiliac joint, requiring multiple surgeries to clean out the infected area. Thomas also developed sepsis.

According to Thomas's testimony, Tisdall did not perform a physical examination on him before administering the injections. On the day of the injections, Thomas was taken to the procedure room at Tisdall's office. Three or four medical staff were already in the room, but Tisdall was not present. When Tisdall came into the room, he made introductions, administered the injections, and left. Tisdall said nothing else to Thomas. Thomas added that he did not know he was receiving six injections until he was on the procedure table.

The Varebrooks also presented evidence that Thomas was unable to return to his prior occupation as a police officer because he was unable to walk without developing a limp, he was unable to run, his left foot was turned in, his left leg was now shorter that his right, he had diminished strength in his legs, and decreased reflexes in his knees and ankles.

Tisdall presented evidence that he complied with the standards of care of a pain management physician. Tisdall's medical expert opined that either Thomas had no infection, or if Thomas had an infection, it was not caused by the injection Tisdall administered to Thomas's left sacroiliac joint. Tisdall also presented evidence that Thomas could still work as a police officer

and that he did not have significant future physical impairment and would not need extensive future medical care.

The jury found that Tisdall's negligence proximately caused the occurrence in question and awarded damages to the Varebrooks. Specifically, the jury awarded Thomas $250,000 in past lost earning capacity; $1.6 million in future lost earning capacity; $580,000 in future medical care expenses; $40,000 in past physical pain and mental anguish; and $10,000 in past disfigurement. The jury awarded Thomas's wife, Rebecca, $10,000 for past loss of household services. The trial court rendered judgment on the jury's verdict. Tisdall appealed.

## JURY ARGUMENT

In his first issue, Tisdall argues the trial court abused its discretion by allowing the Varebrooks to make an improper jury argument. Specifically, Tisdall argues the trial court "committed harmful error by reversing its prior rulings and by permitting improper jury argument by the Varebrooks [] about [the] computer audit trail, which the Varebrooks claimed allegedly proved Dr. Tisdall was not in the procedure room prior to [Thomas's] injections." The Varebrooks counter that Tisdall cannot prevail on this issue because he invited or provoked the jury argument.

At trial, Tisdall acknowledged that he did not remember administering the injections to Thomas on May 27, 2015. Instead, Tisdall relied largely on his routine practices and procedures to reconstruct his actions. Among other things, Tisdall offered, and the trial court admitted, Defendant's Exhibit 240, which was the computer audit trail of Thomas's electronic medical chart maintained by Tisdall.[1] According to Tisdall's testimony, the audit trail showed when he and his medical staff "electronically go[] into and work[] in any individual patient's medical chart." Tisdall further testified: "My understanding is that every time I move to a page in the patient's

---

[1] During their case-in-chief, the Varebrooks also presented the audit trail, which was marked as Plaintiff's Exhibit 5 and admitted into evidence.

chart or look at a different document in the patient's chart, [the audit trail] records my electronic movement in the patient's chart." At trial, Tisdall used the computer audit trail of Thomas's electronic medical chart, in combination with other evidence, to reconstruct a timeline and support his claim that he complied with the standards of care of a pain management physician. Tisdall claimed the audit trail showed that he was in Thomas's electronic medical chart preparing himself to administer the injections immediately before administering Thomas's injections.

The audit trail itself indicated that Tisdall himself had accessed Thomas's electronic records on May 27, 2015, at 2:04:27 p.m., 2:06:11 p.m., 2:14:36 p.m., 2:14:54 p.m., 2:28:29 p.m., and 2:29:38 p.m. Tisdall testified that the server used to maintain these electronic records was in an earlier time zone so the actual time of each of the entries was one hour later. Tisdall further testified that he used only one computer when he was in the procedure room. During cross-examination, however, the Varebrooks elicited testimony from Tisdall that the audit trail did not show the same computer ID every time Tisdall accessed Thomas's medical chart on May 27, 2015. The first four entries listed one computer ID; the last two entries listed a different computer ID.

Near the end of the trial, the Varebrooks asked the trial court to allow them to argue to the jury that "the audit trail, anesthesia record and Dr. Tisdall's testimony put Dr. Tisdall outside of the procedure room[] until 3:14 p.m., before the procedure started."[2] After a hearing outside the jury's presence, the trial court denied the Varebrooks' request. The next morning, however, the trial court granted the request and advised the parties that he would allow the Varebrooks to present jury argument about the audit trail.

---

[2]The Varebrooks filed a brief in support of their motion.

Despite the trial court's favorable ruling, the Varebrooks made no mention of the audit trail in their opening argument to the jury.[3] Instead, Tisdall's counsel was the first to mention the audit trail and the purported discrepancies in the computer IDs during jury argument:

> The reason [Tisdall] did the left side was because he evaluated the patient. He looked at him and he talked to him and went through the chart. Did he document every step of his process? He didn't. But did he do it? Yes.
>
> *Look at this, this is the chart that we walked you through with the audit trail and the records in the chart.* And all this is in evidence for you, but this is the timeline that's created. He checked in—Mr. Varebrook checked in at 2:40 p.m.; he was scheduled for 2:45. At 3:00 p.m. there was the sedation consent time, and you've seen that. *At 3:04 the audit trail shows Dr. Tisdall is in the patient's chart.*
>
> *How would it be—if he wasn't in the chart, how does it fit perfectly within this window of time between 3:00 p.m. and 3:10 p.m.? It fits perfectly by the audit trail.*
>
> *He's in the chart again at 3:06.* So during this time 3:00 to 3:10, he's interacting with Mr. Varebrook, asking him about his pain, doing the physical examination. You saw Dr. Tisdall show you what he does each and every time. Granted he doesn't remember this specific procedure. I wish he did, but he doesn't. But what he can tell you is what he normally does on every type of procedure that he does every single time.
>
> Then we have the anesthesia start time at 3:10. When [the certified registered nurse anesthetist] Brian Gegel is getting Mr. Varebrook ready and before the procedure starts, Dr. Tisdall goes back in the chart and says, okay, let's just make sure we've got everything, I'm getting ready for my sterile procedure, I'm getting the patient draped. *It all fits perfectly with what the audit trail says.*
>
> 3:18 p.m. the procedure starts. 3:29 the procedure ends. You know, there has been a suggestion that [Dr. Tisdall] was rushed, he had too many patients scheduled, he didn't have enough time. You haven't heard a single expert say that you cannot reasonably accomplish this procedure during this window of time. You have not heard a single expert say that it should take you more than ten minutes to do looking at the chart, talking to the patient, doing a physical exam.
>
> There's no evidence that suggests that Dr. Tisdall was rushed or that he didn't do a thorough exam or that he didn't look in the chart for enough time. But they're trying to throw this out, oh, yeah, busy schedule that day, but we have no evidence that even all those patients showed up. They're trying to distract you.

---

[3]Nor did the Varebrooks urge the jury to make any inferences about whether Tisdall was outside the procedure room immediately before administering Thomas's injections.

That's a red herring. What we know is we have all of this well documented in the chart.

Now, the procedure start time and procedure end time. And we have Dr. Tisdall is in the chart where he's finishing the procedure. Now, you're going to hear from [the Varebrooks' counsel] when she gets up to talk after me, because, remember, I don't get to talk after she does. They have the burden of proof, so I would ask you, when she gets up to talk, think "What would [Tisdall's counsel] say in response to that?" Because I don't have the opportunity under the law but I want you to be thinking what would I be saying.

*They're going to argue that at 3:29 there's a different computer ID number on the audit trail.* All right. Remember, Dr. Tisdall doesn't remember specifically every detail of this day. He just has to rely on what his routine practice is.

*All of these computer entries are all on the same computer ID. There is a different computer ID down here. What does that mean? Was there another computer in the room—in the procedure room? Did he maybe step, like he said, two feet outside where the PACU is, which is the post anesthesia care unit to see another patient and sign off, we don't know. It's speculative. We just don't know.*

*What we do know is he's in the chart during the specific window of time that perfectly fits with the anesthesia record. And so you can't speculate what that other computer ID might be because there's no evidence of it, okay? But what we do know is he was in the room and that's verified by [] Brian Gegel as well.*

….

*. . . They're going to try to say that this different computer log says that he was never here*, but you have the evidence from [] Gegel and from the documentation that [Dr. Tisdall] was in the room. And if he wasn't there, how does it fit so perfectly with the other records? We couldn't make it up. We could not make this up. It fits perfectly.

(Emphasis added).

During rebuttal argument, the Varebrooks' counsel argued:

And the truth is that [Dr. Tisdall's counsel] got up here and she spent hours putting on a display and she spent hours creating this timeline, *and she used this audit trail*—and I know that you picked up on this.

*She used this audit trail to say Dr. Tisdall was in the room at this time. Dr. Tisdall was in the room at this time, this corroborates—what this shows you is that Dr. Tisdall was on the computer—well, I think you guys probably remember when [Dr. Tisdall's counsel] did this.*

He's in the chart at 3:04, he's in the chart at 3:06, he's in the chart at 3:14, and then he's in the chart from 3:28 to 3:29 for one minute and 9 seconds.

*Look at the audit trail when you get it, please. He's in the chart for one minute and nine seconds, and that means that he was there the whole time.*

Dr. Tisdall told you under oath he uses one computer in the procedure room. Gegel's anesthesia note shows…the procedure ends at 3:29….

[Dr. Tisdall was] not in the room at 3:04. He was not in the room at 3:06 and he was not in the room at 3:14. Do you know what that is consistent with? That's consistent with what [Thomas] told you.

…

*We know that based on the audit trail and this timeline that they tried to create—to prove he was in the room, that things did not happen the way that Dr. Tisdall said they happened.*

(Emphasis added). Tisdall did not make a contemporaneous objection to the Varebrooks' rebuttal argument.

The standard for prevailing on a complaint about improper jury argument is well-established. *See Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008); *Standard Fire Ins., Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979); *Business Staffing, Inc. v. Viesca*, 394 S.W.3d 733, 749 (Tex. App.—San Antonio 2012, no pet.). Generally, to prevail on a complaint about improper jury argument, an appellant has the burden to establish: "(1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) [that] was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge." *Reese*, 584 S.W.2d at 839. "Error as to improper jury argument must ordinarily be preserved by a timely objection which is

overruled." *Penalver*, 256 S.W.3d at 680. In rare cases, however, a jury argument is incurable, and a party may raise a complaint even though a contemporaneous objection was not made.[4] *Id.*

Here, the record shows Tisdall invited or provoked the jury argument in question. The Varebrooks did not mention, much less discuss, the audit trail or the computer IDs in their opening jury argument. Tisdall was the first to discuss the audit trail during his argument to the jury. Not only did Tisdall discuss the audit trail, he also argued that the jury could not infer anything from the computer IDs listed on the audit trail. The Varebrooks mentioned neither the audit trail, nor the computer IDs until their rebuttal argument.

In his reply brief, Tisdall argues he should not be required to establish that the jury argument was not invited or provoked. However, the Texas Supreme Court has emphasized that to prevail on a jury argument complaint, "[t]he complaining party must not have invited or provoked the improper argument." *Penalver*, 256 S.W.3d at 680. *Id.* Tisdall further argues he had no choice but to address the audit trail during his jury argument because the Varebrooks "did not mention the audit trail in their initial closing argument, which meant they would discuss it in their rebuttal argument and . . . Tisdall's counsel would not be able to respond." Nevertheless, Tisdall had an alternative. Had Tisdall not invited or provoked the audit trail argument, and had the Varebrooks raised it for the first time in their rebuttal argument, Tisdall would have had a valid objection. *See* TEX. R. CIV. PROC. 269(b) (emphasis added) ("In all arguments, and especially in arguments on the trial of the case, the counsel opening shall present his whole case as he relies on it, both of law and facts, and *shall be heard in the concluding argument only in reply to the counsel*

---

[4] "A complaint of incurable argument may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009); *see* TEX. R. CIV. P. 324(b)(5). To rise to the level of incurable jury argument, the argument must "strike[] at the very core of the judicial process." *Phillips*, 288 S.W.3d at 883. Examples of incurable jury argument include appeals to racial prejudice, unsupported accusations of witness tampering by the opposing party, and unsupported, extreme, and personal attacks on opposing parties and witnesses. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 681 (Tex. 2008).

*on the other side.*"); *see also Terrace Land Co. v. Am. Refuse, Inc.*, No. 01-00-00393-CV, 2002 WL 827438, at *8 (Tex. App.—Houston [1st Dist.] April 30, 2002, pet. denied) (stating any error under Rule 269(b) occurs not when the plaintiff fails to discuss an issue in its opening argument, but when it discusses the issue for the first time in its rebuttal argument).

Because the complained-of argument was in fact invited or provoked, Tisdall cannot prevail on his jury argument complaint.[5] *See Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 398-99 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd) (overruling a complaint about the appellee's jury argument when the complained-of argument was made in reply to the appellant's jury argument). We overrule Tisdall's first issue.

### ADMISSION OF EVIDENCE

In his second issue, Tisdall argues "the trial court's admission of five [independent medical examinations] prepared in connection with [Thomas's] Illinois Pension Board proceedings—each of which concluded that [Thomas] was disabled under Illinois[] worker's compensation statutes and could not perform his duties as a [] police officer—were needlessly cumulative and any relevance of the [examinations] was far outweighed by the danger of unfair prejudice." The Varebrooks counter that Tisdall waived any error by not timely objecting to the evidence. Alternatively, they argue the trial court did not commit reversible error by admitting the evidence.

*Standard of Review and Applicable Law*

We review a trial court's evidentiary rulings for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020). We "must uphold a trial court's evidentiary ruling if there is any

---

[5]Having determined that the complained-of jury argument was invited or provoked, we need not address whether or not Tisdall has established the remaining requirements for a successful jury argument complaint: (1) "an error"; (2) "preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial"; (3) that "was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge." *See Standard Fire Ins., Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979).

legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Even if the trial court abuses its discretion in admitting evidence, reversal is only required if the error probably caused the rendition of an improper judgment. *See GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 620 (Tex. 1999); TEX. R. APP. P. 44.1(a)(1).

To preserve error in the admission of evidence, a party must make a timely objection. TEX. R. EVID. 103(a)(1)(A); TEX. R. APP. P. 33.1(a)(1). An objection is timely if it is made when the evidence is offered. *See Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007). Error is waived if the complaining party allows the evidence to be introduced without objection. *Id*. Even when a timely objection is made, an error in the admission of the evidence is waived if similar evidence is admitted without an objection. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004).

To be admissible, evidence must be relevant. TEX. R. EVID. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. A trial court has the authority to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. Rule 403 does not preclude the admission of evidence because it is merely "prejudicial." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018). "[I]n our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." *Id*. Thus, the proper inquiry under Rule 403 is not merely "prejudice," but "unfair prejudice." *Id*. "Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. Additionally, Rule 403 does not discourage the presentation of cumulative evidence in and of itself; instead, it discourages the needless presentation of cumulative evidence.

*In re N.R.C.*, 94 S.W.3d 799, 807 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). "The mere fact that another witness may have given the same or substantially the same testimony is not the decisive factor." *Id*. "When determining [the] admissibility of evidence under Rule 403, trial judges must balance the probative value of the evidence against relevant countervailing factors." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018).

*Tisdall's Objection to the Independent Medical Examinations*

At a hearing outside the presence of the jury, Tisdall's counsel objected to the five independent medical examinations: "Under the rule, Texas Rule of Evidence 403, the balancing test, the probative value by saying that five physicians found him disabled is substantially outweighed by the danger of needless presentation of cumulative evidence and also prejudice." In response, the trial court asked Tisdall's counsel to elaborate on the prejudice part of the objection. Tisdall's counsel then stated, "[I]t bolsters their opinion that he's disabled. And all it is [is] piling—they don't have a difference of opinion . . . . It's just like I can't go out and hire five or ten experts that support Dr. Tisdall. That is cumulative." After considering Tisdall's arguments, the trial court stated the independent medical examinations were neither cumulative nor unfairly prejudicial: "The fact that other people found the same thing, that is not cumulative. That is a fact that the jury is entitled to know." The trial court overruled Tisdall's objection.

Despite the Varebrooks' argument to the contrary, we conclude Tisdall's complaint is preserved for appellate review. *See* TEX. R. EVID. 103(b) (providing that "[w]hen the court hears a party's objections outside the presence of the jury and rules that evidence is admissible, a party need not renew an objection to preserve a claim of error for appeal.").

*Analysis*

The extent of Thomas's physical impairment was a heavily contested issue at trial. The independent medical examinations provided snapshots of Thomas's physical condition at different

points in time. The first medical evaluation, Plaintiff's Exhibit 31, was authored by Dr. Kevin M. Brady, who examined Thomas on August 29, 2016. Brady's evaluation stated Thomas had "permanent joint damage due to septic sacroiliitis of the left sacroiliac joint" and he was "over one year out" from injury. It further noted that Thomas had "abnormal/uneven ga[it] demonstrated with walking and jogging" and "pain with lateral compression of [his] left sacroiliac joint." According to Brady's evaluation, Thomas "no longer possesse[d] the strength, speed or agility necessary for field police work" and he was "unable to perform the physical duties" of a police officer, including wearing load-bearing equipment, such as a duty belt and vest. Brady opined that wearing this type of police equipment would worsen Thomas's symptoms and could contribute to further damage of the affected joint. Brady also noted Thomas's acute congestive heart failure and acute lung injury due to sepsis and further opined that Thomas was unable to return to his original cardiopulmonary status. Finally, in his evaluation, Brady opined that Thomas's condition was "not anticipated to improve" and he was "permanently disabled from police service."

The next medical evaluation, Plaintiff's Exhibit 32, was prepared by Dr. Joseph Alderete, who examined Thomas on September 28, 2016. Alderete's evaluation noted that Thomas was "over [one] year out from injury to [the] left sacroiliac joint, supported by CT imaging demonstrating erosive changes of the left sacroiliac joint following resolution of infection." Alderete's evaluation listed contributing factors, including acute congestive heart failure, acute lung injury, abnormal gait, chronic pain, joint arthritis, and loss of speed in coordinated movements. Alderete's evaluation stated that Thomas's condition was "not anticipated to improve with additional time for recovery" and that Thomas was "unable to perform the physical duties of a civilian police officer," which included wearing load bearing equipment (such as a duty belt and vest) and sitting or standing for prolonged periods of time. This evaluation further noted that

performing these police duties would contribute to Thomas's arthritis and autofusion of the affected joint. According to Alderete, Thomas was "permanently disabled from police service."

Plaintiff's Exhibit 26 was the medical evaluation prepared by Dr. Tomas E. Nemickas, who examined Thomas on March 13, 2017. Nemickas's evaluation contained his observations about Thomas's gait and his pain and discomfort during the examination. Specifically, Nemickas's evaluation stated that Thomas was "unable to perform [a] single-limb jump without apprehension, and attempts to jog note[d] [a] limp and significant antalgic component during the evaluation." It also stated that the residual pain and discomfort Thomas felt in his left sacroiliac joint, "particularly with postural changes requiring the need for constant movement and change of position, as well as his inability to tolerate the additional weight required to function as a police officer," would preclude him from performing full and unrestricted police duties. According to Nemickas's evaluation, Thomas was "functionally at [the] end of natural healing and maximum medical improvement" and his "current disabilities . . . [were] permanent."

Plaintiff's Exhibit 30 was the medical evaluation prepared by Dr. Jay Levin, who, like Nemickas, examined Thomas on March 13, 2017. Levin's evaluation stated that Thomas "cannot perform full and unrestricted police duties." With regard to the likely duration of Thomas's disability, Levin's evaluation stated that Thomas's "symptoms may improve" and "[a]t this point in time it is unknown and reassessment in yearly intervals would be indicated" to determine if Thomas could perform full unrestricted police duties. Levin certified that Varebrook was "disabled" for "full and unrestricted [police] service" as of the date of the examination.

Plaintiff's Exhibit 27 was the medical evaluation prepared by Dr. Richard J. Rodarte, who examined Thomas on March 14, 2017. In this evaluation, Rodarte noted that Thomas exhibited "periodic nonverbal signs of pain such as grimacing and repositioning," that Thomas "appeared to give full effort and his range of motion [was] significantly decreased from normal," that he "was

very tender to palpation over the left SI joint, but normal on the right side," and that he "showed uniformly diminished deep tendon reflexes at the patellar, Achilles, and Babinski regions." Additionally, Rodarte stated Thomas's "hip abduction appeared to be markedly weakened on the left side, compared to the right;" however, Thomas "exhibited a normal gait overall." After examining Thomas, Rodarte opined that he did "not anticipate significant improvement with either treatment or passage of time" and he considered Thomas's "current disabilities" to be "permanent." Rodarte further opined that Thomas could work in a limited capacity with specific restrictions, but that he would "never have the ability to work as a fully functioning patrol officer."

In sum, the medical evaluations occurred over a seven-month timeframe: one occurred in late August 2016, another occurred in late September 2016, and the remaining three occurred over a two-day span in March 2017. Each of the evaluations was authored by a physician who conducted his own physical examination of Thomas, made his own observations about Thomas's condition, and reached his own conclusions. Four of the physicians, Brady, Nemickas, Alderete, and Rodarte, indicated in their evaluations that Thomas's physical condition was unlikely to improve in the future. Another physician, Levin, reached a different conclusion, stating that Thomas's "symptoms may improve" and recommending annual re-assessments of his physical condition.

Because the nature and extent of Thomas's injury was an important issue in the case, the medical evaluations had some probative value. Additionally, the medical evaluations were not "needlessly cumulative." They were made by different physicians who conducted separate examinations of Thomas over the span of seven months. Furthermore, nothing indicates the medical evaluations had any tendency to suggest a decision on an emotional or other improper basis. Thus, the medical evaluations were not unfairly prejudicial. The trial court could have properly decided that the probative value of the medical evaluations was not substantially outweighed by the danger of either needless presentation of cumulative evidence or unfair

prejudice. We conclude the trial court did not abuse its discretion by overruling Tisdall's Rule 403 objection and admitting this evidence.

But even if the trial court had abused its discretion by overruling the Rule 403 objection and admitting this evidence, the error was harmless. Tisdall argued the medical evaluations were needlessly cumulative and unfairly prejudicial because all five medical evaluations concluded that Thomas was not able to work as a police officer. However, the same evidence was admitted elsewhere without objection. During the Varebrooks' case-in-chief, Jacqueline Kelly, a physician, testified that she had reviewed all five medical evaluations and that all five physicians had concluded that Thomas was not able to return to work as a police officer. Tisdall did not object to this testimony. Because Tisdall allowed similar evidence to be admitted without objection, any error in admitting the complained-of evidence was harmless and waived. *See Ramirez*, 159 S.W.3d at 907 ("The general rule is error in the admission of [evidence] is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection."). We overrule Tisdall's second issue.

### MOTION FOR MISTRIAL

In his third issue, Tisdall argues the trial court abused its discretion by denying his motion for mistrial. The Varebrooks counter that Tisdall has not preserved this complaint for appellate review because his motion for mistrial was untimely. Alternatively, the Varebrooks argue that the trial court did not abuse its discretion by denying the motion for mistrial.

At trial, the Varebrooks called Thomas's wife, Rebecca, who is a physician, to testify. During direct examination, the Varebrooks' counsel asked Rebecca: "How do you reconcile being a doctor and suing another doctor." Rebecca answered: "So it was a really serious decision I had to come to. It's not something I take lightly. I would not be here if I did not 100 percent know that Dr. Tisdall was negligent in my husband's care." Tisdall's counsel objected to Rebecca's answer,

indicating that Rebecca was "not qualified" as "established" in the "motion[] in limine."[6] The trial court sustained the objection and immediately instructed the jury to disregard Rebecca's answer. When the Varebrooks' counsel asked the same question again, Tisdall's counsel objected based on relevance. The trial court sustained Tisdall's relevance objection before the witness answered. The Varebrooks' counsel then resumed her direct examination of Rebecca, questioning her until the end of the day.

When trial resumed on Monday, Tisdall's counsel asked the trial court to revisit his objection concerning the above-quoted question and answer. During a hearing outside the jury's presence, Tisdall's counsel asked the trial court to provide the jury another, specific instruction to disregard both the question and answer.[7] Tisdall's counsel then stated that if the trial court granted his request for another instruction to disregard, he was requesting that it strike the question and the answer. Finally, Tisdall's counsel stated that if the trial court granted both his request for another instruction to disregard and his motion to strike, then he was requesting a mistrial. The trial court denied the request for another instruction to disregard, pointing out that he had already instructed the jury to disregard. The trial court also granted the motion to strike and denied the motion for mistrial.

Generally, to preserve error for appellate review, a motion for mistrial must be made when an improper question is asked or an improper answer is given. *See Brownsville Pediatric Ass'n v. Reyes*, 68 S.W.3d 184, 194 (Tex. App.—Corpus Christi-Edinburg 2002, no pet.) ("[O]ur review of the record reveals that the request for mistrial was not made until after some twenty-four pages

---

[6]The motion in limine precluded "[a]ny attempt to elicit opinions by . . . Rebecca Varebrook regarding the standard of care for [Tisdall]" and "[a]ny attempt to elicit opinions by . . . Rebecca Varebrook regarding causation" because she was not qualified to do so under sections 74.401 and 74.403 of the Texas Civil Practice and Remedies Code.

[7]"Ladies and gentlemen, concerning the question and the answer . . . I am instructing you to disregard the question and I'm asking you to disregard the answer because the question was improper and the answer was improper."

of testimony later and after a recess had ensued. We conclude appellants have not properly preserved this issue."); *Rosewood Prop. Co. v. Jim Hardy*, No. 05-94-01227-CV, 1995 WL 479656, at *13 (Tex. App.—Dallas Aug. 10, 1995, no writ) (not designated for publication) (recognizing that a slight delay in moving for mistrial to avoid drawing attention to the error may be acceptable, but that a delay of twenty-five questions and answers was unacceptable and the motion for mistrial was untimely and any error was waived.). Here, the record shows that ninety questions were asked and answered after the complained-of answer was provided. Trial then recessed for the weekend. It was not until trial resumed the following Monday morning that Tisdall's counsel reiterated the earlier objection and moved for a mistrial. This untimely motion for a mistrial failed to preserve Tisdall's complaint for appellate review. *See Reyes*, 68 S.W.3d 194 (concluding an untimely motion for mistrial failed to preserve error for appellate review); *see also In re O.Z.O.*, No. 14-14-00768-CV, 2015 WL 5093198, at *2 (Tex. App.—Houston [14th Dist.] Aug. 27, 2015, no pet.) (mem. op.) (refusing to reach the merits of the appellant's claim when she failed to obtain an adverse ruling on her motion for mistrial).

However, even if Tisdall's complaint had been properly preserved, we would conclude the impact of the question and the answer was cured by the trial court's instruction to disregard. "When the basis for the requested mistrial is a violation of a motion in limine, we review the violations to see if they were curable by an instruction to the jury to disregard the statement." *Moyer v. Moyer*, No. 03-03-00751-CV, 2005 WL 2043823, at *17 (Tex. App.—Austin Aug. 26, 2005, no pet.) (mem. op.). "A motion in limine is a procedural device that permits a party to identify, before trial, certain evidentiary rulings that the court may be asked to make." *Lohmann v. Lohmann*, 62 S.W.3d 875, 881 (Tex. App.—El Paso 2001, no pet.). "The purpose of a motion in limine is to prevent the other party from asking prejudicial questions and introducing prejudicial evidence in front of the jury without first asking the court's permission." *Id*. "Generally, an instruction to disregard is

presumed to be sufficient to cure any error resulting from the violation of a motion in limine." *See Moyer*, 2005 WL 2043823, at \*17; *see also In re A.B.*, No. 02-14-00384-CV, 2015 WL 1967286, at \*3 (Tex. App.—Fort Worth Apr. 30, 2015, no pet.). "When determining whether a violation was curable, we consider whether there were numerous violations, if the violation(s) were inadvertent, whether the instruction to disregard was given promptly, the length of the trial, and the context of the statement that violated the motion." *See Moyer*, 2005 WL 2043823, at \*17.

Here, the witness was not directly asked to provide an expert opinion on the topics the subject of the motion in limine—the standard of care and causation. Instead, Rebecca was asked how she "reconciled" suing another doctor. Rebecca answered that the decision to sue was a serious one and she did not make it lightly. The objectionable part of Rebecca's answer—that she "100 percent kn[e]w" Tisdall "was negligent"—was made in the context of her explaining her personal decisional process. Additionally, the trial court immediately instructed the jury to disregard. This was almost a month-long trial, in which numerous qualified medical experts provided testimony. Based on these circumstances, we conclude that any violation of the motion in limine was cured by the trial court's instruction to disregard. *See id.*, at \*18-19 (considering the facts surrounding the motion in limine violations and concluding the instructions to disregard adequately cured the violations). We overrule Tisdall's third issue.

## CONCLUSION

We affirm the trial court's judgment.

Irene Rios, Justice