

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00441-CV

_____

RANDALL MCDANIEL, Appellant

V.

FARLAND MONROE DINDY AND CORE-MARK MIDCONTINENT, INC.,
Appellees

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-295536-17

Before Kerr and Birdwell, JJ.[1]
Opinion by Justice Birdwell

---

[1]Justice Wallach originally was a member of the panel. After oral argument it was determined that although he made no rulings in the trial court relevant to this appeal, he had previously been the presiding judge of the district court from which the appeal arises while the case was pending in the that court. Once this information came to his attention, he recused himself, and the case was decided by the remaining two justices of the panel. See Tex. R. App. P. 41.1(b).

# OPINION

This is a personal injury case. Randall McDaniel was injured when a three-thousand-pound dolly dislodged from a tractor-trailer rig being driven by Farland Monroe Dindy and crashed into McDaniel's vehicle. McDaniel sued Dindy and his employer, Core-Mark Midcontinent, Inc. (Core-Mark), sometimes referred to jointly as Cross-Appellants. The jury found: (1) Dindy and Core-Mark negligent in causing the occurrence, (2) $350,000 in compensatory damages for McDaniel, including $95,000 in future medical expenses, (3) Dindy grossly negligent and assessed $7,500 in punitive damages against him, and (4) Core-Mark grossly negligent and assessed $400,000 in punitive damages against it. The trial court rendered final judgment jointly and severally against Dindy and Core-Mark for $350,000 in compensatory damages and awarded $7,500 in punitive damages against Dindy, plus prejudgment interest, postjudgment interest, and taxable court costs. The trial court granted, in part, Cross-Appellants' motion for judgment notwithstanding the verdict (JNOV), denying recovery to McDaniel for punitive damages against Core-Mark. The trial court denied those portions of Cross-Appellants' JNOV that sought to deny McDaniel his recovery of compensatory damages in toto, future medical expenses of $95,000 in particular, and recovery of punitive damages against Dindy.

McDaniel appeals the granting of the JNOV, which deprived him of his recovery of punitive damages against Core-Mark. We will affirm the part of the trial court's judgment denying recovery of punitive damages against Core-Mark.

3

Dindy and Core-Mark cross-appeal the partial denial of their JNOV, raising three issues: (1) legally insufficient evidence to support the negligence verdict against them because there was no probative expert testimony regarding the standard of care applicable to them, (2) legally insufficient evidence to support a gross negligence verdict against Dindy because there was no evidence to show that Dindy had actual or subjective awareness of the risk involved but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others, and (3) legally insufficient evidence to support an award of future medical damages to McDaniel. Although we will overrule Cross-Appellants' first two issues, we will sustain Cross-Appellants' third issue and modify the judgment to delete the award of future medical expenses. As modified, the judgment will be affirmed.

## I. Factual Background

This lawsuit arose out of an October 9, 2015 motor-vehicle collision that occurred while Dindy, who was in the course and scope of employment for Core-Mark, was driving a truck and towing a trailer with a converter dolly. While Dindy was driving on Interstate 35, the converter dolly dislodged from the trailer, struck a tow truck, and then struck the vehicle being driven by McDaniel, causing injuries to McDaniel. McDaniel filed suit against Dindy and Core-Mark claiming that both were negligent in causing the collision and resulting injuries and that both were grossly negligent and should be assessed punitive damages.

4

The evidence at trial will be described in more detail below as necessary to address the points raised on appeal. By way of overview, Core-Mark's national transportation manager testified that he conducted a post-accident investigation which led him and Core-Mark to conclude that Dindy had failed to properly secure the dolly before leaving on his trip—which Dindy denied—leading to the dolly's dislodging from the trailer and colliding with McDaniel's vehicle. Dindy testified that he did not know why the dolly dislodged. Dindy was required by company policy and federal regulations to do a pre-trip inspection before leaving on the trip in question, which inspection required checking, among other things, whether the dolly was secure. The evidence is disputed as to whether Dindy performed the inspection. The Core-Mark transportation director also testified that Dindy was terminated for his failure to follow methods for securing the dolly, as documented in Core-Mark's records. However, Dindy testified that he was terminated for having an accident within the first ninety days of his employment with Core-Mark.

There was evidence that Core-Mark utilized an electronic driver logging system called PeopleNet and that Dindy should have used this system to document the required pre-trip inspection of his equipment before leaving on this trip; that the inspection, if done, should have caused Dindy to realize he had not secured the dolly; and that no pre-trip inspection was recorded by Dindy in the PeopleNet system before this accident. Further, the PeopleNet records reflected that Dindy had failed to

document a pre-trip inspection the day before the accident, as well as other potential irregularities for the preceding two weeks.

Who was to review the electronic reports, and when, is ambiguous in the record. Matthew Beard, the Core-Mark corporate representative, testified that at the end of each day the "supervisor" or "somebody" was supposed to review the electronic reports "as soon as he [could]." He also testified that "somebody in the company who [was] receiving these reports should [have] note[d] immediately" if a driver left the yard without doing a report. Further, he testified that ideally Core-Mark wanted the daily electronic reports to be reviewed as frequently as they could be and that daily would have been ideal. However, other than a vague reference to a "supervisor" or "leadership team" being responsible for making reviews, there was no evidence as to who exactly was supposed to be monitoring this reporting system, what monitoring had been done or not done regarding Dindy, and why, or what the corporate job responsibilities were for those who were supposed to have been monitoring the system, for purposes of assessing their status as "vice principals."

McDaniel and his now ex-wife testified about his chronic pain problems and how his injuries had negatively affected his work and personal life and their relationship. Voluminous records from multiple health-care providers were introduced. Two treating pain-management doctors testified that McDaniel had developed a cervical facet joint syndrome as a result of this collision, and they described the treatment that he had received, including chiropractic care, medical care

6

and medications, pain injections, nerve-pain blocks, and a rhizotomy. The doctors testified that his condition is probably permanent and that he will likely need nerve-pain blocks and a rhizotomy once every year or two for the rest of his life. No expert testimony of the reasonableness of past or future medical charges was introduced. Although affidavits regarding the reasonableness of the cost and necessity of past medical care were filed prior to trial pursuant to Texas Civil Practice and Remedies Code Section 18.001 and preadmitted at trial, they were later voluntarily withdrawn, and no jury question regarding past medical expenses was tendered or submitted to the jury.

The jury verdict, JNOV, and judgment resulted as described above.

## II. Standards of Review/Legal Principles

A trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Edwards v. Chevrolet*, 605 S.W.3d 219, 222 (Tex. App.—Fort Worth 2020, no pet.). A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the movant's right to judgment or negates the opponent's right or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Edwards*, 605 S.W.3d at 222.

7

We review the granting or denial of a motion for judgment notwithstanding the verdict under a legal sufficiency standard. *Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 809–28 (Tex. 2005); *B & W. Supply, Inc. v. Beckman*, 305 S.W.3d 10, 21 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We view the evidence in the light most favorable to the verdict. *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Edwards*, 605 S.W. 3d at 222. We credit evidence favoring the jury verdict if reasonable jurors could and must disregard contrary evidence unless reasonable jurors could not. *See Tanner*, 289 S.W.3d at 830; *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007). We will uphold the trial court's JNOV if no evidence supports the jury's finding on a vital fact or if the evidence conclusively establishes the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810. "[E]very reasonable inference deducible from the evidence is to be indulged in" support of the jury's finding. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014); *Norhill Energy LLC v. McDaniel*, 517 S.W.3d 910, 916 (Tex. App.—Fort Worth 2017, pet. denied). When a trial court specifies the

ground upon which it grants a JNOV, an appellant need only challenge the ground relied upon by the trial court. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 323 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 795 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Additionally, we are bound by a heightened standard of review on the jury's gross negligence findings because gross negligence must be proven by clear and convincing evidence. *Columbia Med. Ctr. of Las Colinas v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008) (citing *Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005), and quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). The *Hogue* court has described this heightened standard:

> In a [clear-and-convincing] legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

271 S.W.3d at 248. "'Clear and convincing' evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to

9

the truth of the allegations sought to be established." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012).

Gross negligence consists of both objective and subjective elements. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001). Plaintiffs must prove by clear and convincing evidence that (1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and (2) the defendant had actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *See id.*; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11); *U-Haul Int'l, Inc.*, 380 S.W.3d at 137.

Regarding the objective component, the act or omission must involve "an extreme degree of risk, considering the probability and magnitude of the potential harm to others." *Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019) (quoting *Harrison*, 70 S.W.3d at 785). "[A]n extreme risk is 'not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.'" *Id.* (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)). "An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent." *Id.* at 249 (quoting *Transp. Ins. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994)).

To raise a fact issue on the subjective component, there must be legally sufficient evidence that the actor had actual, subjective awareness of the risk involved but nevertheless was consciously indifferent to the rights, safety, or welfare of others. *Suarez v. City of Texas City*, 465 S.W.3d 623, 633–34 (Tex. 2015). Circumstantial evidence can be used to prove actual knowledge, but it must "either directly or by reasonable inference support that conclusion." *Id.* at 634 (quoting *City of Corsicana v. Stewart*, 249 S.W.3d 412, 415 (Tex. 2008)). "An inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion." *Id.* "The defendant need not have anticipated the precise manner of harm or to whom the injury would befall to have had awareness of the extreme risk." *Zuniga*, 593 S.W.3d at 248.

III. Analysis

(a) McDaniel's Appeal

McDaniel's issue on appeal is that the trial court erred in granting Cross-Appellants' JNOV motion on jury question 5. We will overrule McDaniel's issue. McDaniel's challenge to the jury's answer to question 6 (the amount of punitive damages) is rendered moot by our decision.

Corporations may be liable for punitive damages but only when the act or omission is that of the corporation, not its ordinary agents or servants. *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997). In adopting Restatement of Torts § 909 (1939), in *King v. McGuff*, 234 S.W.2d 403, 405 (Tex. 1950), the Supreme

11

Court held that punitive damages may properly be awarded against a master or other principal because of the act of an agent if, but only if,

>  (a) the principal authorized the doing and the manner of the act, or
>
>  (b) the agent was unfit, and the principal was reckless in employing him, or
>
>  (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
>  (d) the employer or a manager of the employer ratified or approved the act.

*Id.*; *see also Hammerly Oaks, Inc.*, 958 S.W.2d at 391.

The classes of agents or servants considered to be in a managerial capacity are those characterized as vice principals. *Hammerly Oaks, Inc.*, 958 S.W.2d at 391. These people consist of four classes of agents or servants:

>  (a) [c]orporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business.

*Id.* at 391.

The employee's title is not dispositive of his status as a corporate officer, but the category includes one who represents the corporation in its corporate capacity. *Id.* at 391. Acts of lower level supervisory employees who are not vice principals are not legally sufficient to support a finding of gross negligence. *Qwest Int'l Commc'ns Inc. v. AT&T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005). The burden of proof to establish the basis of corporate liability for gross negligence of a servant or agent, i.e., vice principal, rests with the plaintiff. *Id.*

12

Jury question 5 asked if, by clear and convincing evidence, the harm to McDaniel resulted from the gross negligence of Core-Mark. Clear and convincing evidence was properly defined. "Gross negligence" was properly defined using the objective and subjective elements. There were, however, no instructions for the jury regarding whose conduct they could consider in answering this question other than Core-Mark's.

Although it was uncontroverted that Dindy was in the course and scope of his employment with Core-Mark during the time in question, it is equally clear that he was an ordinary servant, and his conduct could not form the basis for a gross negligence claim against Core-Mark. *See id.* at 326.

The only other conduct that could arguably support a claim for gross negligence of Core-Mark, and that to which McDaniel points in his briefing, is Core-Mark's "leadership team" or "supervisor" that was supposed to be monitoring the PeopleNet logging system.[2] However, there was no evidence of the identity of the persons who were supposed to be monitoring the PeopleNet system or their corporate responsibilities that might qualify them as vice principals. Without such evidence, we are left to speculate as to whether the "leadership team" or "supervisor" were vice principals or ordinary employees. Since a gross negligence finding must be

_____

[2]There is no evidence that Core-Mark vice principals authorized or ratified Dindy's conduct in question.

13

supported by clear and convincing evidence, such speculation cannot support a gross negligence verdict.[3] We overrule McDaniel's issue.

(b) Dindy and Core-Mark's Cross-Appeal

Dindy and Core-Mark present legal sufficiency challenges to the judgment as follows:

1. There was legally insufficient evidence to support a negligence verdict against Dindy and Core-Mark because there was no probative expert testimony regarding the applicable standard of care for either Dindy or Core-Mark.

2. There was legally insufficient evidence to support a gross negligence verdict against Dindy because there was no evidence to show that Dindy had actual or subjective awareness of the risk involved but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others.

---

[3]Additionally, Core-Mark contends that there was no evidence to support a gross negligence finding against it because there was no probative expert testimony that established its standard of care of monitoring. *See FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 91 (Tex. 2004). We agree. The standard of care for monitoring of drivers' electronic logging practices is not something within the knowledge of lay persons, and the Supreme Court held in *FFE* that a defendant company's practices or policies are not sufficient to support a negligence finding when expert testimony is required. Likewise, "[t]he mere existence of federal regulations does not establish the standard of care or establish gross negligence per se." *U-Haul Int'l, Inc.*, 380 S.W.3d at 139. Viewing the evidence even in its most favorable light in support of the verdict, company policy and government regulation was all that McDaniel arguably had to rely on in this regard. We cannot say that this record meets the heightened standard of review to support a gross negligence finding against Core-Mark.

14

3. There was legally insufficient evidence to support an award of future medical damages of $95,000.

    (i) Legally Insufficient Evidence to Support Negligence (Cross-Appellants' Issue 1)

Cross-Appellants' first issue is that there was legally insufficient evidence to support a negligence verdict against them because there was no probative expert testimony regarding the applicable standard of care. We will address only the legal sufficiency of the evidence regarding Dindy because Core-Mark conceded that if Dindy's negligence was properly supported by the evidence, it would be imputed to Core-Mark for purposes of ordinary negligence, which would support the judgment against Core-Mark for compensatory damages.

Cross-Appellants contend that "the *FFE* Court firmly established that . . . expert testimony is necessary to establish a trucking company's standard of care." *FFE Transp. Servs.*, 154 S.W.3d at 91. We believe that Cross-Appellants are stretching the holding in *FFE* too far.

In *FFE*, the court noted that the question of whether expert testimony is necessary to establish the standard of care in a given case is reviewed de novo by the reviewing court. 154 S.W.3d at 90. It then described the test for determining whether expert testimony is required to establish a standard of care, using somewhat different terminology in two places. The court first quoted its earlier opinion in *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982), a medical-malpractice case: "Expert testimony is

necessary *when the alleged negligence* is of such a nature as not to be within the experience of the layman." *Id.* at 90 (emphasis added). It then described the test as "whether the *conduct at issue involves the use of specialized equipment and techniques* unfamiliar to the ordinary person." *Id.* at 91 (emphasis added). However, the court did not rule so broadly as to require expert testimony to establish the standard of care in all trucking-company cases. The tests were applied to the specific facts of that case.

Therefore, we must examine de novo the circumstances of this case to determine whether expert testimony was required to establish a standard of care. McDaniel alleged in part—and there was evidence from Core-Mark's national transportation manager, Michael Terry, to support—that Dindy's dolly dislodged and crashed into McDaniel's trailer because Dindy had failed to secure the dolly—he did not connect the safety chains, he did not attach the coupling device onto the trailer, and he did not secure the pintle hook or close the latch.[4] Terry testified that the use of the connecting equipment was "common sense" and use of the safety chains is "just like safety chains on a trailer you pull behind your car. They're there to—if it does—does come—come detached, it's supposed to keep the—the equipment together so it doesn't fly off the side of the road." Given this testimony, and the photographic evidence in the record, we hold that expert testimony was not required to establish the

_____

[4]As Core-Mark's transportation manager, Terry was responsible for overseeing all driver functions, including safety and accidents. At the time of the occurrence in question, he was the Fort Worth region manager for Core-Mark.

standard of care of this allegation of failure to properly secure the dolly. *See AKIB Const. Inc. v. Shipwash*, 582 S.W.3d 791, 804–05 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (holding "in this case, a factfinder applying a 'commonsense understanding' could consider the before and after pictures of the steel building and, with reasonable probability, reach a conclusion that the building was damaged during the dismantling process," and thus that no expert witness testimony was necessary to support a judgment of liability); *MEMC Pasadena, Inc. v. Riddle Power, LLC*, 472 S.W.3d 379, 404 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (stating failure to install protective device on machine which would have prevented accident after promising to install one does not require expert testimony to establish negligence); *Alza Corp. v. Thompson*, No. 13-07-00090-CV, 2010 WL 1254610, at *28–29 (Tex. App.—Corpus Christi–Edinburg Apr. 1, 2010, no pet.) (mem. op.) (holding testimony of corporate representatives of defendant regarding problems with production of defective Duragesic pain patches and handling of complaints were sufficient to exempt case from requirement of expert testimony in negligence claim); *Ching Enters., Inc. v. Barahona*, No. 01-07-00454-CV, 2008 WL 4006758, at *6–8 (Tex. App.—Houston [1st Dist.] Aug. 28, 2008, no pet.) (mem. op.) (considering plaintiff's lay testimony that grating machine "lacked a plate device that would have prevented her hands from getting near the blades" was sufficient to support defendant's negligence without expert testimony).

Having determined that expert testimony was not required to establish the

standard of care regarding Dindy's negligence in failing to secure the dolly, we overrule Cross-Appellants' first issue.[5]

(ii) Legally Insufficient Evidence to Support Dindy's Gross Negligence (Cross-Appellants' Issue 2)

Cross-Appellants' Issue 2 contends that "[t]here was legally insufficient evidence to support a gross negligence verdict against Dindy because there was no evidence to show that Dindy had actual or subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others." They argue that because of the following evidence, "there is legally insufficient evidence that Dindy was aware of a specific peril, or that Dindy was aware that the converter dolly was not properly secured and just didn't care":

- Dindy had been a commercial truck driver for 30 years;

- Core-Mark had trained Dindy;

- Core-Mark gave Dindy written instructions on how to secure the converter dolly;

- Dindy had attached converter dollies over the years;

- Dindy had never before had a converter dolly come loose from a truck or trailer he was driving/pulling;

---

[5]Cross-Appellants have not challenged the legal sufficiency of the evidence under an ordinary negligence standard of care not requiring expert testimony.

18

- Dindy believed he had attached the converter dolly properly on October 9, 2015;

- Dindy believed that he had performed a proper pre-trip inspection on October 9, 2015;

- Dindy did not know why the converter dolly came loose;

- Dindy would not have left the yard if he did not think he had hooked the safety chains from the converter dolly to the trailer; and

- Dindy attached the converter dolly the same way he did every other time that he attached converter dollies.

This argument, however, is inconsistent with our standard of review on a legal insufficiency review of a gross negligence finding:

> In a legal sufficiency review, **a court should look at all the evidence in the light most favorable to the finding** to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. **To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so.**

*Hogue*, 271 S.W.3d at 248 (emphasis added) (quoting *Hall*, 168 S.W.3d at 170). We must therefore also review the evidence in support of the jury's verdict of gross negligence. Terry testified that

- hooking up trailers was probably the most important part of Dindy's job;

19

- securing the dolly is common sense;

- the knowledge required to secure the dolly was required for Dindy's commercial driver's license;

- the knowledge to secure the dolly was part of Dindy's training to pull double loads like this;

- Terry inspected the tractor, trailer, and dolly after the accident, and he determined that the dolly had not been properly connected;

- Dindy failed to hook up the safety chains, attach the coupling device onto the trailer, and secure the pintle hook or close the latch;

- Dindy was terminated for not following methods to hook up the dolly, and Dindy "[a]bsolutely" did not do what he should have done; and

- it is dangerous to drive without safety chains attached.

Dindy testified that

- he had been a commercial truck driver for 30 years;

- Core-Mark had trained him;

- Core-Mark gave him written instructions on how to secure the converter dolly;

- he had attached converter dollies over the years;

- the collision occurred because the dolly came loose from his trailer, but he did not know why it came loose;

- he did everything that he was supposed to do before he left on his trip, including inspecting the dolly;

- he knew that if the dolly were to become disengaged, it could cause serious injury or death and that it would even take an "act of God" for it not to cause serious injury if it came loose;

- he knew that a reasonable and prudent truck driver would make sure that the dolly would not come off;

- he was supposed to do a pre-trip inspection and record it in the PeopleNet system;

- doing a pre-trip inspection is required by Core-Mark policy and federal regulation;

- pre-trip inspection included checking to see that the dolly is secured;

- pre-trip inspection is a safeguard to make sure everything has been done correctly;

- pre-trip inspection is designed to determine if there is a safety issue or hazard;

- pre-trip inspection will reveal if the chains are not properly connected;

- he understood, without anyone having to explain it to him, the importance of documenting everything;

- he always logs his pre-trip inspection in the PeopleNet system;

21

- failure to do a pre-trip inspection is possibly consciously putting others at risk of serious harm or injury; and

- there is no pre-trip inspection documented in the PeopleNet log before he left the yard and was involved in the collision in question.

This evidence constitutes legally sufficient evidence to support the gross negligence finding against Dindy. He was consciously aware of the need to secure his dolly before leaving on the trip, he knew how to secure his dolly, he knew that the failure to secure the dolly would put others on the road at serious risk of serious injury or death, he knew that he had a duty under company policy and federal regulations to do a pre-trip inspection that was designed to detect safety hazards in the connections of the dolly, and he knew that he was required to document his pre-trip inspection in the PeopleNet system. Although there is a dispute in the testimony about whether he did secure the dolly and do a pre-trip inspection, we are required to presume that the jury resolved these factual disputes in accordance with its verdict. *See J.F.C.*, 96 S.W.3d at 266; *Rayner v. Dillon*, 501 S.W.3d 143, 148 (Tex. App.—Texarkana 2016, pet. dism'd by agr.). From this evidence, the jury could have reasonably inferred that Dindy chose to drive his vehicle without securing his dolly, doing a pre-trip inspection, or both and that doing so would expose others on the road to a risk that would require an "act of God" to prevent serious harm. This evidence is legally sufficient to support the jury's finding of the objective-and-subjective-awareness prongs of the gross negligence test.

*See Rayner*, 501 S.W.3d at 150–52; *see also USA Truck, Inc. v. West*, 189 S.W.3d 904, 909 (Tex. App.—Texarkana 2006, pet. denied) ("Given that [the driver] testified he was aware his actions posed a risk, and given the extreme circumstances surrounding his actions, the jury could have reasonably concluded that [the driver] was not only aware his actions created a risk, but that he was also aware of the magnitude of that risk."). We overrule Cross-Appellants' Issue 2.

### (iii) Legally Insufficient Evidence to Support Future Medical Expenses (Cross-Appellants' Issue 3)

Cross-Appellants contend that the damages evidence and testimony elicited at trial was legally insufficient to support an award of $95,000 in future medical expenses. Part of Cross-Appellants' argument is that there is no probative evidence of the reasonable costs of past or future medical expenses upon which a judgment for future medical expenses could be based. Because our disposition of this argument is dispositive of this point, we need not address Cross-Appellants' other arguments under this issue.

The case law regarding legal sufficiency of the evidence for awards for future medical expenses has essentially been developed by the various courts of appeals within the general parameters of legal sufficiency review established by the Supreme Court. *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 842, 863 (Tex. App.—Fort Worth 2003, pet. denied). Certain propositions are generally cited by the various courts of appeals, for example:

- the plaintiff must show that there is a reasonable probability that medical expenses will be incurred in the future, *id.* at 862–63; *see also Brownsville Pediatric Ass'n v. Reyes*, 68 S.W.3d 184, 191 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.); *City of San Antonio v. Vela*, 762 S.W.2d 314, 321 (Tex. App.—San Antonio 1988, writ denied); *Hughett v. Dwyre*, 624 S.W.2d 401, 405 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.);

- the plaintiff is not required to establish the need for future medical consequences of his injury by expert testimony based on reasonable medical probability, *Bush*, 122 S.W.3d at 863; *see also Whole Foods Mkt. Sw., L.P. v. Tijerina*, 979 S.W.2d 768, 781 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); *Furr's, Inc. v. Logan*, 893 S.W.2d 187, 194 (Tex. App.—El Paso 1995, no writ); *Gladewater Mun. Hosp. v. Daniel*, 694 S.W.2d 619, 621 (Tex. App.—Texarkana 1985, no writ); **but, to sustain an award of future medical expenses,** "the plaintiff must present evidence to establish that in all reasonable probability, future medical care will be required and **the reasonable cost of that care**," *Gunn v. McCoy*, 554 S.W.3d 645, 671 (Tex. 2018) (emphasis added) (quoting *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)); *see also Bill Miller Bar-B-Q Enters., Ltd. v. Gonzales*, No. 04-04-00747-CV, 2005 WL 2176079, at *2 (Tex. App.—San Antonio Aug. 24, 2005, pet. denied) (mem. op.);

- the reasonable value of future medical care may be established by evidence of the reasonable value of past medical treatment, *Perez v. Williams*, No. 02-21-00395-CV, 2022 WL 17351581, at *9, *10 (Tex. App.—Fort Worth Dec. 1, 2022, no pet.) (mem. op.); *see also Harvey v. Culpepper*, 801 S.W.2d 596, 599 (Tex. App.—Corpus Christi 1990, no writ); *City of Rosenberg v. Renken*, 616 S.W.2d 292, 293 (Tex. App.—Houston [14th Dist.] 1981, no writ); *Thate v. Tex. & Pac. Ry.*, 595 S.W.2d 591, 601 (Tex. App.—Dallas 1980, writ dism'd);

- "[a]n award of future damages in a personal injury case is always [somewhat] speculative," *Perez*, 2022 WL 17351581, at *9 (citing *Pipgras v. Hart*, 832 S.W.2d 360, 365 (Tex. App.—Fort Worth 1992, writ denied)); "[l]ife expectancy, medical advances, and the future cost of products, services[,] and money are not matters of certainty," *id.* (quoting *Pipgras*), and thus "[t]he jury is instead asked to determine what medical expenses are 'reasonabl[y] probab[le]'" to be incurred in the future, *id.* (first quoting *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied), and then citing *Bush*, 122 S.W.3d at 862–63); in making that

determination, a jury may "extrapolate an award of future damages from proof of other matters" such as the medical care rendered before trial, the nature of plaintiff's injuries, and the plaintiff's condition at the time of trial, *id.* (first citing *Antonov*, 168 S.W.3d at 908, and then citing *Bush*, 122 S.W.3d at 863, and *Pipgras*, 832 S.W.2d at 365); *see also LMMM Houston #41, Ltd. v. Santibanez*, No. 01-16-00724-CV, 2018 WL 4137971, at *10 (Tex. App.— Houston [1st Dist.] Aug. 30, 2018, no pet.) (mem. op.); *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 426 (Tex. App.—Eastland 2006, no pet.); *Bill Miller Bar-B-Q*, 2005 WL 2176079, at *2;

- an award of future medical expenses rests within the sound discretion of the jury, and appellate courts are hesitant to disturb a factfinder's conclusion regarding an award of future damages. *Antonov*, 168 S.W.3d at 908; *see also LMMM Houston #41, Ltd.*, 2018 WL 4137971, at *11.

Despite these well-accepted general principles, we are presented with a question of apparent first impression for this court, i.e., whether a judgment based on a jury verdict for future medical expenses that is otherwise supported by evidence of other factors such as the nature and extent of medical care rendered before trial, the permanent nature of plaintiff's injuries and need for future care, and the plaintiff's condition at the time of trial, is supported by legally sufficient evidence if there is no probative evidence of the *reasonable cost* of past medical care or the *reasonable cost* of future medical care. Other courts of appeals have split on this question. We will hold that the award is not supported by legally sufficient evidence under these circumstances.

The evidence reflected that McDaniel, age 46 on the date of the occurrence, developed a cervical facet joint syndrome as a result of this collision. This syndrome involves damage to a nerve, causing pain. There was testimony on the debilitating

nature of McDaniel's pain and the negative impacts on his life from suffering from chronic pain. His treatment prior to trial included chiropractic care and physician pain management including medications, multiple injections, cervical-medial-nerve-branch blocks, and rhizotomy of the affected nerve. The medical testimony from his treating physicians, Dr. Gregory Gardner (family practice and pain medicine) and Dr. Bradley Eames (anesthesiologist and pain medicine), reflected that the facet joint syndrome was permanent and that McDaniel would need additional nerve blocks and rhizotomies every one to two years for the rest of his life. Although medical expense affidavits under Texas Civil Practice and Remedies Code Section 18.001 were filed and pre-admitted, they were subsequently withdrawn. *See* Tex. Civ. Prac. & Rem. Code Ann. § 18.001. McDaniel testified he had paid $6,150 for the rhizotomy and that he expected to incur similar amounts in the future for similar services. The billing record for this procedure reflected payments by McDaniel of $2,300.

A letter from Dr. Gardner, dated February 13, 2019, recited that McDaniel's estimated future medical care would include MRIs; repeat cervical-medial-branch blocks, rhizotomies, or both; and rehabilitative therapy. He stated that the cervical medial branch blocks averaged $1,350 each and that McDaniel could require up to three blocks every one to two years. Dr. Gardner further stated that physical rehabilitation cost $200 per session with up to 24 sessions per year. He could not comment on the cost of the rhizotomy or MRI. He made no comments on the *reasonableness* of any of these charges.

26

There was also a treatment-record entry by a chiropractor, John Kaphart, BSDC, on February 10, 2016, that McDaniel had a high probability of frequent exacerbations of his problems and that in reasonable medical probability he would incur future medical expenses estimated at $1,200 per year. Dr. Kaphart made no reference to the *reasonableness* of the anticipated charges.

In short, although there was evidence reflecting charges that were incurred in the past and estimates of future medical expenses, there was no expert testimony regarding the *reasonableness* of McDaniel's past medical expenses or anticipated future medical expenses.

Our court has not dealt with this specific issue before. Our previous cases involved appellate records that included evidence that supported the amount of reasonable future medical costs: *Perez*, 2022 WL 17351581, at *7–8 (factual sufficiency review with medical-expense affidavits for past medical expenses and expert testimony); *Antonov*, 168 S.W.3d at 908–09 (expert testimony); *Bush*, 122 S.W.3d at 863–64 (expert testimony); and *Pipgras*, 832 S.W.2d at 366 (expert testimony).

We will first address cases from our sister courts that have addressed similar situations. A similar case supporting affirmance in this case is the *Bill Miller Bar-B-Q Enterprises, Ltd. v. Gonzales* case. 2005 WL 2176079, at *1. Gonzales injured her back when she fell on a defective toilet seat in the barbecue restaurant. *Id.*

The court summarized the medical evidence as follows:

Gonzales's physician, Dr. Mario Bustamante, testified that Gonzales presented to him with complaints of low back pain radiating down her left leg. Her symptoms were consistent with her diagnosis of a herniated lumbar disk with a small fragment extrusion. Dr. Bustamante treated her conservatively with a series of three epidural steroid injections, which improved Gonzales's condition but did not eliminate her pain. He indicated that when he last saw Gonzales she had continuing back pain and slightly improved leg pain. When asked about Gonzales's long-term prognosis, Dr. Bustamante stated that her condition "will require fairly close follow-up and the treatment will be based on the patient's symptomatology." Absent a worsening condition, such as paralysis or loss of muscle control, surgery would not be recommended. Additionally, pain without neurological deficit would be treated conservatively, such as with epidural steroid injections. He stated that a physician could administer a three-shot series of injections as often as every year to alleviate an individual's pain. According to Dr. Bustamante, these epidural injections cost up to $2,000 per shot.

*Id.* at *2 (footnote omitted).

After reducing the future medical expenses award from $50,000 to $26,000 due to lack of proof of need for future injections costing $24,000, the court affirmed the balance of the jury's award based on Dr. Bustamante's testimony, Gonzales's medical condition and past treatment, and the jury's award of past medical expenses of $7,330.[6] *Id.* at *5. In her concurring and dissenting opinion, however, Justice Duncan pointed out that there was no expert testimony that the charges for the proposed future treatment were reasonable, for which reason she would have reversed the trial court's judgment awarding future medical expenses. *Id.* (Duncan, J., concurring and dissentinting).

---

[6]The opinion is silent regarding whether there was evidence of reasonableness of the past medical charges. It just states that such was the amount shown as incurred.

Two cases that support reversal are *Rosenboom Machine & Tool, Inc.*, 995 S.W.2d at 828, and *LMMM Houston #41, Ltd.*, 2018 WL 4137971, at *13–14. In *Rosenboom*, a product liability case, Machala was sitting in a wheelchair being hoisted into a van. *Rosenboom*, 995 S.W.2d at 819. The hoist failed and dropped her chair. *Id.* According to her doctor, she suffered a vertebral fracture requiring hospitalization. *Id.* at 824, 826. According to her family, this hospitalization lasted three to four weeks. *Id.* at 828. She suffered severe pain, ongoing pain and disability, and additional medical treatment until trial. *Id.* The parties stipulated that she had incurred reasonable and necessary past medical expenses of $9,596.04. *Id.* The jury found, and the trial court awarded, future medical expenses of $10,000. *Id.* at 820. The court of appeals reversed the award of future medical expenses, holding that there was legally insufficient evidence to support the award because there was no testimony establishing in reasonable probability that Machala would require future care and the cost of such care. *Id.* at 828.

In *LMMM*, Santibanez tripped and fell at LMMM's meat market. *LMMM Houston #41, Ltd.*, 2018 WL 4137971, at *1. He sought recovery for personal injuries under a premises liability theory. *Id.* The jury found in Santibanez's favor, awarding a variety of damages, including future medical expenses of $120,000. *Id.* at *4. The trial court reduced that amount to $20,000 in response to LMMM's insufficient evidence JNOV. *Id.* On cross-appeal, Santibanez challenged the granting of the JNOV,

contending that there was legally sufficient evidence to support the award of $120,000 in future medical expenses. *Id.* at \*9.

The evidence revealed that Santibanez had received extensive chiropractic care and orthopedic care for low back, knee, and foot complaints and a neurological referral for headache and memory issues. *Id.* at \*11. He had an MRI of his back and physical therapy. *Id.* As in our case, the court noted that the record contained voluminous medical records from Santibanez's multiple health-care providers, but there was no testimony or affidavit proof of the reasonableness of the past medical expenses and proof of such for future medical expenses. *Id.* at \*12–13. Although Santibanez testified that his past medical expenses totaled $19,396 (including a breakdown by provider), and that he expected his future care to cost the same as his past care, the court noted,

> Although there is evidence to show that in all reasonable probability Santibanez will require some medical care in the future, **the evidence of the actual cost of such future medical care is minimal at best.** Regarding the cost of his future medical care, the only evidence in the record is Santibanez's testimony as to the cost of his past medical care, which totaled $19,396, and his opinion that if he were to continue treatment at the Southeast Chiropractic Center or with Dr. Rodriguez, which he was not at the time of trial, he would expect the costs to be similar to what he had been previously charged in regard to those two specific health care providers. But neither Santibanez's testimony nor any other evidence in the record can support the jury's award of $120,000 of future medical expenses. *See Rosenboom Mach.*, 995 S.W.2d at 828 (insufficient evidence supported jury's award of $10,000 for future medical expenses where no testimony established cost of future medical care).

*Id.* at *13 (emphasis added). The court followed its rationale in *Rosenboom* and affirmed the trial court's JNOV. *Id.* at *13–14.

In order to resolve this issue, we will first return to one of the general principles underlying the review of awards of future medical expenses, that to recover future medical expenses "the plaintiff must present evidence to establish that in all reasonable probability, future medical care will be required *and the reasonable cost of that care.*" *Rosenboom*, 955 S.W.2d 828 (emphasis added). So, how does one prove the reasonable cost of future medical care? The preferred method is to establish future medical expenses through expert medical testimony. *Antonov*, 168 S.W.3d at 908. Here, no expert evidence on the reasonable cost of future care was offered.

What alternative is there to establishing the reasonable cost of future care other than by expert testimony? The reasonable value of future medical care may be established by evidence of the reasonable value of past medical treatment. *See Whole Foods Mkt.*, 979 S.W.2d at 781; *Thate*, 595 S.W.2d at 601. What is necessary to prove reasonableness of past medical care? Generally, expert testimony is required to establish that past medical expenses are reasonable. *Perez*, 2022 WL 17351581, at *6. While a physician is usually the expert utilized for this task, other individuals may qualify to opine on that topic depending on the procedural tools involved. *See In re Allstate Indem. Co.*, 622 S.W.3d 870, 876 (Tex. 2021); *Gunn*, 554 S.W.3d at 674; *Perez*, 2022 WL 17351581, at *6. In this case there was no testimony or documents in evidence that addressed the reasonableness of past medical expenses. The only

31

evidence about past medical expenses was the amount paid, which is legally insufficient to support a recovery of past or future medical expenses. *Cotton Patch Café v. McCarty*, No. 2-05-082-CV, 2006 WL 563307, at \*4 (Tex. App.—Fort Worth 2006, no pet.) (mem. op.).

While acknowledging that awards of future medical expenses generally rest in the sound discretion of the factfinder because of the uncertainties involved, we are also cognizant of the fact that juries cannot be left to merely speculate about the reasonable cost of future medical expenses. *Harvey*, 801 S.W.2d at 599 ("We will not affirm an award of future medical expenses based on speculation."). Because there was no probative evidence of reasonable costs of either past or future medical expenses from which the jury could make an assessment of reasonable future medical expenses, we hold that the record in this case does not contain legally sufficient evidence of the reasonable cost of future medical expenses to support the jury's answer to question 2(g) and the court's judgment based thereon. We sustain Cross-Appellants' third issue.

IV. Conclusion

We overrule McDaniel's issue on appeal. We overrule Cross-Appellants' first two issues on appeal, but we sustain their third issue. We will modify the judgment to remove the award of future medical expenses for McDaniel. The judgment will be affirmed as modified.

/s/ Wade Birdwell
Wade Birdwell
Justice

Delivered:  March 23, 2023